STATE of Wisconsin, Plaintiff-Respondent,

v.

John TOMLINSON, Jr., Defendant-Appellant.†

Court of Appeals

*No. 00–3134–CR. Submitted on briefs July 3, 2001.—Decided August 14, 2001.*

2001 WI App 212

(Also reported in 635 N.W.2d 201.)

† Petition to review granted 11-27-01.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Grau Law Office* by *John J. Grau*, Waukesha.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Christian R. Larsen*, assistant attorney general.

Before Wedemeyer, P.J., Fine and Schudson, JJ.

¶ 1. WEDEMEYER, P.J. John Tomlinson, Jr. appeals from a judgment entered after a jury found him guilty of first-degree re ckless homicide, contrary to Wis. Stat. §§ 940.02(1), 939.05 and 939.63 (1999–2000).[1] He also appeals from an order denying his postconviction motions. He raises three issues: (1) whether the trial court erred when it denied Tomlinson's motion seeking to suppress evidence; (2) whether the trial court erred when it allowed the State to introduce Otis Coleman's preliminary hearing testimony after Coleman asserted the Fifth Amendment during the trial; and (3) whether the trial court erred in instructing the jury that a baseball bat constitutes a dangerous weapon. Because the trial court's ruling on the suppression motion was not erroneous, because Coleman's preliminary hearing testimony was not erroneously admitted, and because the instructional error did not prejudice Tomlinson, we affirm.

---

[1] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

## I. BACKGROUND

¶ 2. At approximately midnight on February 5, 1999, Otis Coleman and Lewis Phillips were walking near the 1100 block of West Chambers Street in the City of Milwaukee. Tomlinson, his wife, and a third individual approached the pair and Phillips asked Mrs. Tomlinson for a cigarette. He offered to pay a quarter. Mrs. Tomlinson stated that she would sell one for fifty cents. Phillips responded, "a quarter, bitch." At that point, Tomlinson confronted Phillips for calling his wife a bitch. Tomlinson then told Phillips, "[y]ou better be here when I get back," and walked away. A couple of minutes later, Tomlinson returned wielding a baseball bat. Tomlinson swung the bat and hit Phillips in the left knee, causing him to bend forward. Tomlinson then swung the bat and struck Phillips in the left side of the head, causing him to fall to the ground. Coleman, fearing that the bat would be turned on him, left the area.

¶ 3. Angela Green was walking westbound in the 1100 block of West Chambers Street in the early morning hours of February 6, 1999, when she heard a woman yell, "kick the bitch in the head." She recognized this woman as Mrs. Tomlinson. Shortly thereafter, she saw Mr. Tomlinson walking toward her carrying a baseball bat. His two teenage daughters, who were carrying broom and mop handles, were with him. After Green passed the Tomlinson family, she came upon Phillips who was bleeding from the head. Green pointed out the victim to Robert Haynes, who lived close to that area. Haynes went into his home and called 9-1-1.

¶ 4. Paramedics and police arrived at the scene and Phillips was transported to Froedert Memorial Hospital, where he died several days later from cerebral

691

injuries due to blunt force trauma. The medical examiner indicated that Phillips's skull was fractured, consistent with a forceful blow to the head with a baseball bat.

¶ 5. On the evening of February 27, 1999, Milwaukee Police Detective Dennis Kuchenreuther and several of his colleagues were investigating the Phillips homicide. They spoke with Green, who provided a description of the Tomlinsons and the events she had witnessed. Green identified John Tomlinson from a photo array, and informed the detective that Tomlinson, his wife, and two teenage daughters lived at 2948 North 11th Street. Kuchenreuther and several other officers proceeded to the Tomlinson residence. Kuchenreuther knocked on the back door and identified himself as a police detective. He asked if they could come in to look for John Tomlinson. A black female aged fifteen or sixteen opened the door and allowed the officers to enter. John Tomlinson was standing behind the teenage girl, and did not object when the officers entered.

¶ 6. The police officers arrested Tomlinson, his wife Michelle, and the two daughters, Monterio and Kamisha, for the homicide of Phillips. After being placed under arrest, Michelle and the two daughters asked if they could put on their socks and shoes, which were located in a bedroom. The officers allowed them to do so but, for safety reasons, followed them into the bedroom. When the police entered the bedroom, they saw, in plain view, a baseball bat and some broom or mop handles. Recognizing these items as the possible murder weapons, the police seized them as evidence.

¶ 7. Tomlinson was charged with first-degree reckless homicide, while using a dangerous weapon, as party to the crime. He pled not guilty and filed a motion seeking to suppress the evidence seized at the time of

his arrest. The trial court conducted the suppression hearing, and Detective Kuchenreuther was the only witness to testify. The trial court found that the entry was consensual.

¶ 8. The case was tried to a jury in June 1999. During the trial, Coleman was called by the State. Outside the presence of the jury, Coleman refused to answer the questions posed, invoking the Fifth Amendment. Based on this refusal, the State moved to admit Coleman's testimony from the preliminary hearing. Over defense objection, the trial court ruled that Coleman was unavailable, and that his prior testimony could be admitted pursuant to Wis. Stat. § 908.045(1).[2] The trial court found that Coleman's reliability and credibility had been sufficiently challenged at the preliminary hearing to satisfy the confrontation rule. In addition, the trial court indicated that it would allow Tomlinson to introduce additional impeachment material, including Coleman's prior conviction record, prior statements, and a memorandum outlining the consideration Coleman received for cooperating in the investigation and testifying at the preliminary hearing.

¶ 9. After testimony was concluded, the trial court read the jury instructions. Specifically, the trial court advised the jurors:

---

[2] Wisconsin Stat. § 908.045(1) provides that if the declarant is unavailable, former testimony may be admitted. The pertinent portion states:

> Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of another proceeding, at the instance of or against a party with an opportunity to develop the testimony by direct, cross-, or redirect examination, with motive and interest similar to those of the party against whom now offered.

> If you find the defendant guilty, you must answer the following question. Did the defendant commit the crime of first[-]degree reckless homicide while using, threatening to use or possessing a dangerous weapon.

> Before you may answer the question yes, you must be satisfied beyond a reasonable doubt that the defendant committed the crime while using, threatening to use or possessing a dangerous weapon and possessed the dangerous weapon to facilitate the crime.

> Dangerous weapon means a baseball bat.

¶ 10. After instructions were complete, the State advised the court that the jury should be allowed to decide whether or not a baseball bat constituted a dangerous weapon, and the instruction given took that decision away from the jurors. In response to the State's concern, both defense counsel and Tomlinson indicated that they wanted to leave the instruction as it was read. The jury returned a guilty verdict.

¶ 11. Tomlinson filed postconviction motions, which were summarily denied. He now appeals.

## II. DISCUSSION

*A. Motion to Suppress.*

¶ 12. The first issue is whether the entry into the Tomlinson home was consensual. The trial court, based on the testimony of Detective Kuchenreuther, found that the entry was consensual. We agree.

¶ 13. Our review of suppression rulings is mixed. *State v. Matejka*, 2001 WI 5, ¶ 16, 241 Wis. 2d 52, 621 N.W.2d 891, *cert. denied,* 121 S. Ct. 2207. We will uphold the trial court's findings of fact if they are not clearly erroneous; however, we will independently determine whether or not the search was unconstitutional. *Id.*

¶ 14. Consent to search is one of the well-established exceptions to the constitutional requirements of both a warrant and probable cause. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).[3] The trial court found that the entry was consensual, based on the detective's testimony at the suppression hearing and inferences arising from the totality of the circumstances. That finding is not clearly erroneous. Detective Kuchenreuther testified at the suppression hearing that he knocked at the door, and when the teenage girl answered, he asked if he could come in. He indicated that the teenage girl opened the door and allowed him to enter. He also testified that Tomlinson was standing nearby and observing this, but he did not object to the detective's entry. We agree with the trial court that a reasonable inference arises from this testimony—that the individual who answered the door consented to the entry.

¶ 15. Tomlinson argues that this testimony could support the inference that the teenage girl merely turned to inform her parents that someone was at the door. Although we do not disagree that this is another rationally based view of the evidence, the trial court,

---

[3] As in all Fourth Amendment search cases involving consent, the state has the burden of proving that the search was the result of "free, intelligent, unequivocal and specific consent without any duress or coercion, actual or implied." *State v. Johnson*, 177 Wis. 2d 224, 233, 501 N.W.2d 876 (Ct. App. 1993) (citation omitted). "[T]he proper test for voluntariness of consent under the fourth amendment is whether under the totality of the circumstances it was coerced." *Id.* Coercion or duress was never asserted in the instant case and, therefore, we need not address it.

after personally observing the testimony of Detective Kuchenreuther, found that the teenage girl expressly consented to the entry when she opened the door and allowed the officers to walk in behind her. The record supports the trial court's finding that the teenage girl's response to the detective's request to enter—opening the door, walking into the house, and allowing the officers to follow her into the house—was sufficient to convey her consent. *Schneckloth*, 412 U.S. at 222 (gestures or conduct may convey consent to search).

¶ 16. Tomlinson argues, however, that the child who opened the door did not have the authority to consent to the entry. We disagree. Tomlinson contends that nothing in the record shows that the minor child who answered the door had authority to consent to the entry by the officers. This court acknowledges that this specific issue was not fully and completely addressed, primarily because the "authority to consent" was not raised until the postconviction motion. Nevertheless, we conclude that there is sufficient information in the record to establish that the teenage girl had actual authority to consent to the entry.

¶ 17. The evidence in the record strongly supports the logical inference that the girl who answered the door was one of Tomlinson's daughters. His two daughters were fourteen and fifteen years old. The police had been given a description of the family by Green, and were advised by Green that Tomlinson lived with his wife and two teenage daughters. There was no other visitor or person mentioned. The third-party consent doctrine provides that a third-party may consent to enter a home when that third party has common authority over the premises to be searched. *United States v. Matlock*, 415 U.S. 164, 171 (1974). Common

authority has been referred to as the "mutual use of the property by persons generally having joint access or control for most purposes." *Id.* at 171 n.7. Here, it was not unreasonable for the police officers to believe that the teenage girl who answered the door was one of Tomlinson's daughters, and that she had mutual use of the property sufficient to consent to the entry.

¶ 18. Tomlinson suggests that the age of the teenage daughter prevents her from consenting to the entry of the parents' home; that a minor does not have "common authority" to consent to entry. We disagree. Although Wisconsin has not yet directly addressed the issue of a child's authority to consent to a search of his or her parents' home, we are persuaded by cases from other jurisdictions holding that a teenage child has actual common authority to consent to an entry, at least into the common areas of the shared home. *Doyle v. State*, 633 P.2d 306, 308–09 (Alaska Ct. App. 1981) (teenager could allow police to enter living room to talk with father); *Harmon v. State*, 641 S.W.2d 21, 23 (Ark. 1982) (sixteen-year old could admit police into home), *overruled on other grounds by White v. State*, 717 S.W.2d 784 (Ark. 1986); *Mears v. State*, 533 N.E.2d 140, 143 (Ind. 1989) (fourteen-year old could consent to entry); *People v. Swansey*, 379 N.E.2d 1279, 1281–82 (Ill. App. Ct. 1978) (thirteen-year old could consent to entry; *State v. Folkens*, 281 N.W.2d 1, 4 (Iowa 1979) (fourteen-year old could consent to entry); *In re Anthony F.*, 442 A.2d 975, 978 (Md. 1982) (individual who appeared to be thirteen years old could consent to entry).

¶ 19. In determining whether a minor has actual authority to consent to the entry, two factors may guide the courts. The first factor is the age of the child

because "as children grow older they . . . acquire discretion to admit . . . [persons] on their own authority." 3 Wayne R. LaFave, *Search and Seizure,* § 8.4(c), 773 (3d ed. 1996). In the instant case, although it is not clear whether the fourteen-year-old or fifteen-year-old daughter answered the door, either had the authority to consent to entry. Both girls are within the age where courts usually find that the child has acquired the discretion to admit persons on their own authority.

■

¶ 20. The second factor to consider is the scope of the consent and whether the entry was to a common area or a more private area of the family home. *Id.* Here, the consent was access into a common area of the home, the front entranceway and the kitchen, as opposed to the entire residence, or what could arguably be considered more private areas. In addition, the consent in this case was not solely that of a teenage girl. Detective Kuchenreuther testified that Tomlinson was nearby when the police entered and proceeded into the kitchen, and at no time did he object to the entry.

¶ 21. Based on the foregoing facts and circumstances, we conclude that the entry was constitutionally permissible; therefore, the trial court did not err in denying the motion to suppress.

*B. Coleman's Testimony.*

¶ 22. Tomlinson next argues that the trial court erroneously exercised its discretion when it allowed the State to read into evidence Coleman's testimony from the preliminary hearing because: (1) he was not afforded an adequate opportunity to confront Coleman at the preliminary hearing; and (2) Coleman was not

"unavailable" so as to justify admission of the former testimony under Wis. Stat. § 908.045(1). We are not persuaded.

¶ 23. Whether or not former testimony should be admitted pursuant to Wis. Stat. § 908.045(1) is a discretionary ruling, subject to review under the erroneous exercise of discretion standard. *State v. Drusch*, 139 Wis. 2d 312, 317–18, 407 N.W.2d 328 (Ct. App. 1987). We will not disturb a discretionary ruling if the trial court applied the proper law to the pertinent facts and reached a reasonable decision. *Id.* Moreover, whether Tomlinson's confrontation rights under the Sixth and Fourteenth Amendments to the United States Constitution, and art. I, § 7 of the Wisconsin Constitution were violated is ultimately a legal issue reviewed independently. *State v. Stutesman*, 221 Wis. 2d 178, 182, 585 N.W.2d 181 (Ct. App. 1998).

¶ 24. In *State v. Bauer*, 109 Wis. 2d 204, 325 N.W.2d 857 (1982), the Wisconsin Supreme Court set forth the standard for determining whether the type of evidence challenged here may be admitted. First, we must consider whether the evidence fits into a recognized hearsay exception. *Id.* at 215. Here, Coleman's preliminary hearing testimony fits under Wis. Stat. § 908.045(1), which allows former testimony to be introduced when the declarant is unavailable. This testimony was given by Coleman in another proceeding, with the opportunity to develop the testimony by both the State and Tomlinson. Thus, the first step of the *Bauer* standard is satisfied.

¶ 25. Second, the confrontation clause must be considered. *Id.* at 215. This requires that the witness be unavailable and that the evidence "bear some indicia of reliability." *Id.* "If the evidence fits within a firmly rooted hearsay exception, reliability can be inferred and the evidence is generally admissible," unless "there are unusual circumstances which may warrant exclusion of the evidence." *Id.* The hearsay-rule exception for prior testimony recognized by WIS. STAT. § 908.045(1) is "firmly rooted." *Id.* at 216.

¶ 26. When Coleman was called to testify at the trial, the following exchange occurred:

> Q Mr. Coleman, are you willing to answer questions regarding your knowledge of the homicide of Lewis Phillips, also know as Little?
>
> A I would — any questions asked here today, I would have to invoke my Fifth Amendment rights. It might tend to incriminate me. I don't care to do any talking about anything. I don't think that I'm mentally stable enough at the present time to answer any questions about anything.
>
> . . . .
>
> [The court then instructs Coleman to answer the question.]
>
> Q Are you willing to answer any questions at all regarding your knowledge of the homicide —
>
> A No.
>
> Q — of February 5 of 1999 to February —
>
> A I must invoke the Fifth.

Q Let me ask the question. From February 5 of 1999 to February 6th of 1999 at or about 1134 West Chambers Street, here in the City and County of Milwaukee, State of Wisconsin, the topic on which you testified at the preliminary hearing in this case?

A I must invoke my Fifth Amendment rights.

Q What do you mean you're invoking your Fifth Amendment rights?

A I do not wish to say anything that might tend to incriminate me or to get me harmed in any way, shape or fashion.

Q Or get you what?

A Or harmed by you, the Court, anybody.

Q Is it my understanding you're to invoke your Fifth Amendment privilege regarding any questions asked of you about the topic I just brought up?

. . . .

A About anything. I invoke my Fifth Amendment rights about anything you have to ask me.

¶ 27. The prosecutor then asked the trial court to order Coleman to answer the questions. The trial court stated that it was going to order Coleman to answer. Coleman then interrupted asking, "[c]an I invoke my Fifth Amendment?" The trial court responded that it was going to order Coleman to answer the questions. The questioning continued:

Q Are you fearful of retaliation for being known as a snitch if you cooperate in this case?

701

A I invoke my Fifth Amendment rights.

. . . .

THE COURT: . . . the Court's ordering you to answer that question.

THE WITNESS: I don't understand.

THE COURT: The Court orders you to answer the question.

¶ 28. Coleman then answered the question "in part." When the prosecutor asked him the next question, he again invoked his Fifth Amendment privilege, the trial court ordered him to answer, and Coleman indicated that he could not talk about the incident. When Tomlinson's counsel cross-examined Coleman, he again invoked the Fifth and refused to answer.

¶ 29. Tomlinson contends that the trial court should have persisted further with the witness, found him in contempt, and ordered him to answer each question. Although we do not disagree that such a course would have created a more complete record, the foregoing clearly demonstrates that Coleman persistently refused to answer the questions, and there was no offer of proof that further inquiry would have made a difference to Coleman. Accordingly, under the standard set forth above, the trial court was correct when it found Coleman to be "unavailable."

¶ 30. The next part of the test is whether the evidence demonstrates indicia of reliability. As noted, WIS. STAT. § 908.045(1) is a "firmly rooted" hearsay exception, so the reliability of the preliminary hearing testimony "can be inferred." *Bauer*, 109 Wis. 2d at 216. Under the *Bauer* analysis, the only remaining question is whether there are any "unusual circumstances" for excluding the preliminary hearing examination. *Id.*

■

¶ 31. Tomlinson contends that the case does present unusual circumstances, arguing that because preliminary examinations focus on probable cause, they do not provide an adequate opportunity to develop sufficient cross-examination. Having reviewed the preliminary examination transcript in the instant case, we cannot agree with Tomlinson's contention. Tomlinson's counsel clearly challenged the reliability and credibility of Coleman during the cross-examination at the preliminary hearing. Tomlinson's counsel questioned Coleman about the accuracy of his recollections, secured an admission that Coleman had been consuming alcohol, and questioned why Coleman abandoned Phillips while he was in obvious danger. It is well established that the Confrontation Clause is satisfied by the *opportunity* for effective cross-examination. *Delaware v. Fensterer*, 474 U.S. 15, 18 (1985). Tomlinson was provided with the opportunity to cross-examine Coleman at the preliminary hearing. Except in extraordinary cases, no inquiry into the *effectiveness* of the cross-examination is required. *Ohio v. Roberts*, 448 U.S. 56, 73 n.12 (1980).

¶ 32. In addition, the State stipulated to, and the trial court ordered, the admission of additional impeachment evidence to challenge Coleman's credibility, including his ten prior convictions, prior statements, and documentation revealing the consideration Coleman received for cooperating in the investigation and testifying at the preliminary hearing. Finally, Tomlinson failed to·identify any evidence or cross-examination materials he was not allowed to offer to impeach Coleman's credibility.

■

¶ 33. For all these reasons, we conclude that the admission of Coleman's preliminary hearing testimony

did not constitute an erroneous exercise of discretion and did not violate any constitutional confrontation rights.

*C. Jury Instruction.*

¶ 34. Tomlinson's last issue relates to the jury instruction, wherein the trial court advised the jury: "Dangerous weapon means a baseball bat." He argues that this constituted "plain error" and requires reversal. We disagree.

¶ 35. At the time the instruction was given, the prosecutor immediately intervened and, outside the presence of the jury, advised the court: "It should be up to the jury to determine if a baseball bat is a dangerous weapon." However, defense counsel stated: "We want it the way it was read." The trial court then questioned both defense counsel and Tomlinson to confirm that, indeed, they wanted the jury instructed that a baseball bat was a dangerous weapon. Tomlinson personally answered affirmatively.

¶ 36. Now, on appeal, Tomlinson asserts that the instruction constitutes plain error, despite his position at trial indicating he wanted the instruction read. Tomlinson has waived this argument. Tomlinson and his counsel made a knowing election between alternative courses of action, resulting in a strategic waiver of this instructional error. He cannot create his own error by deliberate choice of strategy and then ask to receive the benefit from that error on appeal. *Shawn B.N. v. State*, 173 Wis. 2d 343, 372, 497 N.W.2d 141 (Ct. App. 1992).

¶ 37. Tomlinson argues that his single affirmative response, "yeah," to the trial court in response to whether he wanted the jury to be told that a baseball

bat is a dangerous weapon was insufficient. We disagree. Although a more in depth colloquy is required when a defendant waives his or her right to a jury trial, the same is not required when a defendant "merely concede[s to] an element of the charged crime." *State v. Benoit*, 229 Wis. 2d 630, 600 N.W.2d 193 (Ct. App. 1999). Here, Tomlinson's affirmative response was not a waiver of his right to a jury trial on that element, but a concession to an element of the charged crime. The jury was instructed on all of the elements of the crime, and Tomlinson received a jury trial on every element. Accordingly, we conclude that Tomlinson's single affirmative response under the facts and circumstances here was sufficient to waive this issue.

¶ 38. In a related argument, Tomlinson argues that his trial counsel was ineffective for failing to object to the trial court's instruction that a baseball bat is a dangerous weapon. We cannot agree.

■■■■■■

¶ 39. In order to establish that he did not receive effective assistance of counsel, Tomlinson must prove two things: (1) that his lawyer's performance was deficient; and (2) that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Sanchez*, 201 Wis. 2d 219, 548 N.W.2d 69 (1996). A lawyer's performance is not deficient unless he "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Even if Tomlinson can show that his counsel's performance was deficient, he is not entitled to relief unless he can also prove prejudice; that is, he must demonstrate that his counsel's errors "were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Id.* Stated another way, to satisfy the

prejudice-prong: " 'A defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Sanchez*, 201 Wis. 2d at 236 (citation omitted).

■■■■■■

¶ 40. In assessing Tomlinson's claim, we need not address both the deficient performance and prejudice components if he cannot make a sufficient showing on one. *Strickland*, 466 U.S. at 697. The issues of performance and prejudice present mixed questions of fact and law. *Sanchez*, 201 Wis. 2d at 236. Findings of historical fact will not be upset unless they are clearly erroneous, *id.*, and the questions of whether counsel's performance was deficient or prejudicial are legal issues we review independently, *id.* at 236–37.

¶ 41. Looking at the facts of this case, we cannot conclude that trial counsel's performance was deficient or prejudicial. Tomlinson took the baseball bat and struck Phillips so hard in the knee that Phillips doubled over. Then Tomlinson swung the bat again and struck Phillips in the head, fracturing his skull, causing him to fall to the ground, and eventually killing him. There is no reasonable probability that the jurors would not have found the baseball bat in this case to be a dangerous weapon.

■■■■■■

¶ 42. Further, even if trial counsel objected to the instruction, the result of the proceeding would not have been different. Under these facts, the jury would have found that the baseball bat constituted a dangerous weapon. Accordingly, we reject Tomlinson's claim that his trial counsel provided ineffective assistance.

*By the Court.*—Judgment and order affirmed.