STATE of Wisconsin, Plaintiff-Respondent,

v.

John TOMLINSON, Jr., Defendant-Appellant-Petitioner.

Supreme Court

*No. 00–3134–CR. Oral argument May 2, 2002.—Decided July 9, 2002.*

2002 WI 91

(Also reported in 648 N.W.2d 367.)

502

505

For the defendant-appellant-petitioner there were briefs by *John J. Grau* and *Grau Law Office,* Waukesha, and oral argument by *John J. Grau.*

For the plaintiff-respondent the cause was argued by *Eileen W. Pray,* assistant attorney general, with whom on the brief was *James E. Doyle,* attorney general.

¶ 1. JON P. WILCOX, J. This case is a review of

a published decision of the court of appeals, *State v. Tomlinson*, 2001 WI App 212, 247 Wis. 2d 682, 635 N.W.2d 201, which upheld the conviction of John Tomlinson, Jr., for being a party to the crime of first-degree reckless homicide while using a dangerous weapon, in violation of Wis. Stat. §§ 940.02(1), 939.05, and 939.63 (1999–2000)[1].

¶ 2. Tomlinson challenges his conviction on three disparate grounds. First, Tomlinson argues that the baseball bat and mop handles, which were allegedly used in the homicide and which were found in Tomlinson's house following his arrest, should have been suppressed because the police did not obtain proper consent to enter Tomlinson's house. Second, Tomlinson claims that the circuit court erred when it allowed the State to introduce a witness's preliminary hearing testimony after that witness asserted his Fifth Amendment privilege during trial. Third, Tomlinson claims that the circuit court erred in instructing the jury that a baseball bat constitutes a dangerous weapon.

¶ 3. The Milwaukee County Circuit Court, Jeffrey A. Wagner, Judge, denied Tomlinson's post-conviction motions on each of the three claims. On appeal, the court of appeals upheld the ruling of the circuit court. *See State v. Tomlinson*, 2001 WI App 212, ¶ 1. Tomlinson petitioned this court for review, and we accepted. We now affirm the decision of the court of appeals on all three issues.

I. BACKGROUND

¶ 4. On February 27, 1999, Milwaukee Police Detective Dennis Kuchenreuther and several other mem-

---

[1] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise indicated.

bers of the Milwaukee Police Department were investigating the death of Lewis Phillips. Phillips had suffered blunt force trauma to the head late on the night of February 5 or early on the morning of February 6, 1999, on the 1100 block of West Chambers Street in Milwaukee. Phillips died from his injuries several days later.

¶ 5. During the investigation, police received information from Angela Green, a witness to several events which immediately followed the homicide. Green informed police that she had been walking on the 1100 block of West Chambers late in the evening of February 5 or early in the morning of February 6, 1999, when she heard a woman yell, "Kick the bitch in the head."

¶ 6. Green then observed a man walking toward her, carrying a baseball bat. She knew the man as "John" or "Red." Green also saw two teenaged girls, whom Green recognized as the man's daughters, carrying what appeared to be broom or mop handles. After Green passed them on the street, she came upon Phillips, who was on the ground, bleeding from the head. Green identified a photograph of Tomlinson as the man she knew as "John" or "Red." Green also identified the woman's voice she had heard as Tomlinson's wife. Green informed the police of Tomlinson's address, and pointed out the house to the officers.

¶ 7. At about 8:50 p.m. that same day, Detective Kuchenreuther and the other officers went to Tomlinson's house and knocked on the back door. According to Kuchenreuther's testimony, the officers were met at the door by an African-American female who appeared to be 15 or 16 years old. Tomlinson himself was standing nearby, in the house. According to Kuchenreuther, the girl identified herself, but the record does not reflect what that identification actually was. Kuchenreuther then informed the girl that they

511

were looking for Tomlinson, and they asked for permission to enter the house. The girl said nothing, opened the door, and walked into the house. The officers followed her into the entryway and the kitchen area. The officers did not have a search warrant for the house or an arrest warrant for Tomlinson.

¶ 8. After the officers entered the house, they placed Tomlinson, Tomlinson's wife (Michelle), and Tomlinson's two daughters (Monteria and Kamisha), under arrest. Later trial testimony confirmed that Monteria and Kamisha were 14 and 15 years old at the time. After being placed under arrest, Michelle, Monteria, and Kamisha asked if they could put shoes and socks on before they left. The officers allowed them to do so, and escorted the three into an adjoining bedroom. In the bedroom, in plain view, the officers observed a baseball bat and some broom or mop handles lying between the bed and the wall. The officers seized the items as evidence.

¶ 9. Tomlinson was charged with being a party to the crime of first-degree reckless homicide under Wis. Stat. §§ 940.02(1) and 939.05, and was charged with the penalty enhancer for the use of a dangerous weapon, under Wis. Stat. § 939.63.[2] Tomlinson pleaded not guilty.

---

[2] Wis. Stat. § 939.63 states, in pertinent part:

(1)(a) If a person commits a crime while possessing, using or threatening to use a dangerous weapon, the maximum term of imprisonment prescribed by law for that crime may be increased as follows:

. . . .

2. If the maximum term of imprisonment for a felony is more than 5 years or is a life term, the maximum term of imprisonment for the felony may be increased by not more than 5 years.

¶ 10. At the preliminary hearing, testimony was taken from Otis Coleman, another witness to the events surrounding the homicide. Coleman testified that he had seen Phillips on the night in question with two other people, whom Coleman described as one African-American male and one African-American female. Coleman identified the male as Tomlinson.

¶ 11. Coleman testified that Phillips had asked the female if he could buy a cigarette from her for a quarter. Coleman then heard the female respond, "I have to have 50 cents, nigger." Coleman testified that he then heard Phillips say "A quarter, bitch." Coleman then saw Tomlinson approach Phillips and ask, "What did you call my wife?" Coleman testified that the verbal altercation between Tomlinson and Phillips escalated, and that Tomlinson left the area, telling Phillips to be there when he got back.

¶ 12. Coleman testified that he and Phillips began walking away, when Tomlinson returned about two minutes later, carrying a baseball bat. Coleman testified that Tomlinson confronted Phillips, and struck him three times with the baseball bat: once in the leg, once in the head, and a third time after Phillips was on the ground.

¶ 13. At trial, the State called Coleman to testify. When the prosecutor asked Coleman if he was willing to answer questions regarding the case, Coleman responded:

> I would—any questions asked here today, I would have to invoke my Fifth Amendment rights. It might tend to incriminate me. I don't care to do any talking about anything. I don't think I'm mentally stable enough at the present time to answer any questions about anything.

Coleman proceeded to invoke his Fifth Amendment privilege in response to all of the questions asked by the

prosecutor. When the prosecutor asked what Coleman meant by his Fifth Amendment rights, Coleman responded:

> I do not wish to say anything that might tend to incriminate me or to get me harmed in any way, shape or fashion.

Coleman continued to invoke the Fifth Amendment the entire time he was on the stand, even after being ordered by the court to answer the State's questions, and during an attempted cross-examination by defense counsel.

¶ 14. After Coleman was excused, the State moved to have Coleman declared unavailable under Wis. Stat. § 908.04(1)(a) and (b), and to have Coleman's preliminary hearing testimony admitted under the hearsay exception in Wis. Stat. § 908.045(1). The circuit court granted the State's motion, and allowed Coleman's preliminary hearing testimony to be introduced.

¶ 15. At the close of the trial, the court instructed the jury with regard to the dangerous weapon sentence enhancer. That instruction was:

> If you find the defendant guilty, you must answer the following question. Did the defendant commit the crime of first-degree reckless homicide while using, threatening to use, or possessing a dangerous weapon?

> Before you may answer the question yes, you must be satisfied beyond a reasonable doubt that the defendant committed the crime while using, threatening to use, or possessing a dangerous weapon and possessed the dangerous weapon to facilitate the crime.

> Dangerous weapon means a baseball bat.

When the court finished issuing the jury instructions, the prosecutor asked for a sidebar and the jury was

514

excused. The prosecutor pointed out that there was a footnote in Wis JI—Criminal 990, the standard jury instruction for the dangerous weapon sentence enhancer, which suggested that it should be up to the jury to decide whether a baseball bat is a dangerous weapon.[3]

¶ 16. Tomlinson's defense attorney, when asked, stated that they wanted the jury instruction to remain as the court had read it. The prosecutor noted that leaving the jury instruction as it had been read would essentially relieve the State of its burden on that element, and asked the defendant if he understood that consequence. Tomlinson replied, "Yeah."

¶ 17. The court then asked the defendant the same question. Defense counsel again replied that they wanted the instruction the way it had been read. The

---

[3] The footnote cited by the prosecutor states:

The Committee suggests using the part of the statutory definition that applies to the facts of the case. "Dangerous weapon" is defined as follows in § 939.22(10):

> **(10)** "Dangerous weapon" means any firearm, whether loaded or unloaded; any device designed as a weapon and · capable of producing death or great bodily harm; any electric weapon, as defined in § 941.295(4); or any other device or instrumentality which, in the manner it is used or intended to be used, is calculated or likely to produce death or great bodily harm.

For example, if the evidence shows a firearm was used, the sentence at note 2 would read: " 'Dangerous weapon' means any firearm, whether loaded or unloaded." Similar statements should be used for the other alternatives provided by the statutory definition. See Wis JI—Criminal 910 for suggested instructions for the other alternatives and a discussion of some of the substantive issues relating to "dangerous weapons."

Wis JI—Criminal 990, n.4.

court asked the defendant if he understood what was happening, to which the defense attorney replied, "[The defendant] told me yes and I'm repeating it. He told me yes." The jury found Tomlinson guilty of being party to the crime of first-degree reckless homicide while using a dangerous weapon, and he was sentenced to 38 years in prison.

¶ 18. Tomlinson filed a post-conviction motion challenging the propriety of the police search, the admissibility of Coleman's preliminary hearing testimony at trial, and the court's jury instruction on the dangerous weapon element. The circuit court denied Tomlinson's motion on all three issues. In a published opinion, *State v. Tomlinson,* 2001 WI App 212, the court of appeals upheld the decision of the circuit court. Tomlinson petitioned this court for review, which we accepted. We now affirm the court of appeals' decision, and uphold Tomlinson's conviction. We address each of Tomlinson's three issues in turn.

## II. CONSENT TO SEARCH

¶ 19. We first review the propriety of the police seizure of the baseball bat and the mop/broom handles at Tomlinson's house. The Fourth Amendment to the U.S. Constitution and Article I, Section 11 of the Wisconsin Constitution each states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." Whether police conduct has violated the constitutional guarantees against unreasonable searches and seizures is a question of constitutional fact. *State v. Griffith,* 2000 WI 72, ¶ 23, 236 Wis. 2d 48, 613 N.W.2d 72. Thus, we give deference to the circuit court's findings of evidentiary and histori-

cal fact, but we independently apply those historical facts to the constitutional standard. *Id.*

■

¶ 20. Here, the police entered Tomlinson's home to arrest him without a warrant. Searches conducted without a warrant are presumptively unreasonable. *State v. Matejka,* 2001 WI 5, ¶ 17, 241 Wis. 2d 52, 621 N.W.2d 891; *State v. Phillips,* 218 Wis. 2d 180, 196, 577 N.W.2d 794 (1998). However, the police may enter a home without a warrant to make an arrest if two circumstances are present. First, the police must have probable cause to make the arrest, and second, there must be an exception to the warrant requirement, such as exigent circumstances or consent to enter. *Laasch v. State,* 84 Wis. 2d 587, 593–94, 267 N.W.2d 278 (1978). Tomlinson does not dispute the existence of probable cause to arrest, and the State does not contend that there were exigent circumstances in this case. Our inquiry is thus confined to the question of whether the police received consent to enter Tomlinson's home.

■

¶ 21. The State has the burden of proving consent by clear and convincing evidence. *Schneckloth v. Bustamonte,* 412 U.S. 218, 222 (1973); *Bumper v. North Carolina,* 391 U.S. 543, 548 (1968); *State v. Rodgers,* 119 Wis. 2d 102, 107, 349 N.W.2d 453 (1984). Here, Tomlinson does not challenge the voluntariness of the consent, nor does he claim that the consent was given under duress or coercion.[4] Tomlinson's challenge is limited to the authority of the girl who opened the door to give consent to the police officers to enter the house,

---

[4] We also note that Tomlinson does not challenge the propriety of the officers' subsequent entry into the bedroom, or the actual seizure of the bat and the mop/broom handles once the officers were in the bedroom.

and the girl's actions in allegedly giving the consent. We focus our discussion on those issues.

■

¶ 22. Under certain circumstances, consent to search may be given by a third person—that is, by a person other than the subject of the search. *United States v. Matlock,* 415 U.S. 164, 171 (1974); *State v. Kieffer,* 217 Wis. 2d 531, 542, 577 N.W.2d 352 (1998). The U.S. Supreme Court case *United States v. Matlock,* 415 U.S. 164, is most often cited for the doctrine of third-party consent. In that case, the Court upheld the search of a bedroom, which the defendant occupied jointly with a cohabitating girlfriend. *Id.* at 177–78. The defendant's girlfriend gave the police permission to search the bedroom, where the police found money that had been taken during a bank robbery in which the defendant was a suspect. *Id.* at 166–67.

¶ 23. In upholding the search, the Court discussed the theoretical bases for third-party consent. The Court stated that consent to search may be "obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *Id.* at 171. The Court went on to explain that:

> [t]he authority which justifies the third-party consent does not rest upon the law of property . . . but rests rather on the mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Id.* at 171 n.7 (citations omitted).

¶ 24. This court has also addressed the concept of third-party consent in several cases, most notably in *State v. Kieffer,* 217 Wis. 2d 531. Applying the concepts of *Matlock* in that case, we held that the defendant's father-in-law lacked the actual authority to consent to a police search of a garage attic, which the father-in-law rented to his daughter and the defendant, and in which the couple had essentially established a "separate household." *Kieffer,* 217 Wis. 2d at 545–46.

¶ 25. More importantly, in *Kieffer* we also discussed the relationship between actual authority and apparent authority to grant third-party consent. Citing *Illinois v. Rodriguez,* 497 U.S. 177 (1990), we held that even if a third party lacks the actual authority to consent to a search, police may rely upon the third party's apparent common authority, if such reliance is reasonable. *Kieffer,* 217 Wis. 2d at 548. In that case, we noted, "officers may not always take third-party consent to a search at face value, but must consider the surrounding circumstances." *Id.* at 549.

¶ 26. In the present case, the State argues that the girl who answered the door had both actual and apparent authority to give the officers consent to enter. Tomlinson challenges the State's assertions on both of these counts. In considering the facts surrounding the officers' request for consent, we agree with the State's argument that the girl had apparent authority to give the police limited consent to enter, and therefore, we are not required to address the question of whether or not the girl had actual authority to consent.

¶ 27. Tomlinson first claims that the girl could not have had authority to give consent because there is nothing in the record to show that the girl was one of Tomlinson's daughters. We agree with the court of appeals that this issue was not fully addressed at trial. However, any question of whether or not the girl was

Tomlinson's daughter would be more consequential in a determination of actual authority to allow entry. Under the apparent authority rule, however, we think that there was sufficient evidence for the officers to reasonably conclude that the girl who answered the door was one of Tomlinson's daughters.

¶ 28. Before coming to the house, the police officers knew that Tomlinson had two teenage daughters, later shown to be 14 and 15 years old, who themselves were suspects in the crime. The police had obtained descriptions of the two daughters by interviewing witnesses to the crime. Although the specific identification is not in the record, the girl who answered the door—described by Detective Kuchenreuther as a 15– or 16–year-old African-American girl—had identified herself to the detective. Tomlinson was apparently standing nearby when the door was opened,[5] and he did not object to the girl's letting the officers into the house. After the police entered the house, they arrested Tomlinson, his wife, and both of his daughters. There was no evidence of anyone else in the house, and no one else was arrested or questioned at that time. Under these circumstances, it was more than reasonable for the officers to conclude that the girl who answered the door was one of Tomlinson's daughters.

¶ 29. Given the conclusion that the officers could have reasonably believed that the girl was Tomlinson's daughter, we must next consider the question of when a minor child has the authority to consent to police entry of his or her parents' home, and whether the officers reasonably believed that the girl in this case had the

---

[5] Detective Kuchenreuther testified that Tomlinson was standing behind the girl who answered the door, at the top of a short flight of stairs that led up to the kitchen.

authority to do so. We begin with the basic principle articulated by the U.S. Supreme Court in *Matlock*. That is, third-party consent can be obtained from a person who possesses "common authority over or other sufficient relationship to the premises or effects sought to be inspected." *Matlock*, 415 U.S. at 171. This common authority rests on the "mutual use of the property by persons generally having joint access or control for most purposes" and that "any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Id.* at 171 n.7.

¶ 30. A minor child who lives in the same home with his or her parents or guardians obviously shares use of the property with the parents or guardians to some extent. However, it should also be obvious that a child generally does not share mutual use of the property with a parent to the same extent that such use might be shared between spouses or between cohabitating adults. In general, a parent's interest in the property will be superior to that of the child, and the child will generally not have the equivalent authority of a parent or guardian to consent to a search of the premises.

¶ 31. Still, there are some situations where a child could reasonably possess the authority to consent to a search, or to consent to police entry of a parent's home. Whether the child possesses such authority will depend on a number of factors, and courts must look at the totality of the circumstances to make such a determination. The primary factors to be considered are the child's age, intelligence, and maturity, and the scope of the search or seizure to which the child consents. 3

Wayne R. LaFave, *Search and Seizure* § 8.4(c), at 773–74 (3d ed. 1996). To a lesser extent, the court should also consider the extent to which the child has been left in charge, and the extent to which the parent has disclosed his or her criminality to the child. *Id.* § 8.4(c), at 774; *United States v. Clutter*, 914 F.2d 775, 778–79 (6th Cir. 1990).

¶ 32. The age, intelligence, and maturity of the child are important because, as a child gets older and more mature, the child will generally be entrusted with greater responsibility. *See, e.g., Laasch,* 84 Wis. 2d at 592–93 (holding that the State did not prove that the defendant's five-year-old son possessed the capacity, intelligence, or authority to give consent for police to enter the apartment at midnight). The scope of the consent is also particularly important because there are parts of a family's home where the parents have an increased privacy interest, and where the child could not reasonably give consent to a search, even though a parent could. In some situations, however, a child might reasonably be able to give consent for police to enter or search a common area of the home where the parents and the child share a greater mutual use and a similar expectation of privacy.

¶ 33. In the present case, given the age of the girl who answered the door, the limited scope of the entry, and the surrounding circumstances, the officers could have reasonably concluded that the consent to enter the house was valid. A high school-aged child will likely have at least some authority to allow limited entry into the home. Courts that have addressed this issue are generally in agreement on this point. *See, e.g., Doyle v. State,* 633 P.2d 306, 309 (Alaska Ct. App. 1981); *Mears v. State,* 533 N.E.2d 140, 142 (Ind. 1989); *State v. Folkens,* 281 N.W.2d 1, 4 (Iowa 1979); *State v. Griffin,* 756 S.W.2d 475,

484–85 (Mo. 1988). There is no evidence here that the girl who answered the door lacked the intelligence or maturity such that the officers' reliance on the consent would have been called into question.

¶ 34. The scope of the entry and the surrounding circumstances in this case bolster our conclusion that the officers reasonably relied on the third-party consent. The officers were only allowed into the entryway and the kitchen. They did not search or enter into the rest of the house on the basis of the initial consent. Additionally, the officers came to the house on a Saturday evening, rather than extremely late at night or early in the morning. We also give weight to the fact that Tomlinson was nearby when the door was opened. Tomlinson did not object to the police coming in, and the daughter did not hesitate or turn to ask Tomlinson's permission to let the officers in. Under these circumstances, the officers reasonably could have believed that Tomlinson entrusted the girl with at least some authority to give consent to enter, and certainly with enough authority to allow the limited entry that occurred in this case.

¶ 35. Tomlinson next suggests that, even if the girl had the authority to allow entry, her actions were insufficient to give the officers consent to enter. Tomlinson argues that the actions of the girl who answered the door were consistent with a person turning away from the door to inform someone else that the police were there to speak with him. Tomlinson suggests that, particularly because a minor answered the door, more should be required to show consent.

¶ 36. Whether an individual in fact gives consent is a question of historical fact. *Phillips,* 218 Wis. 2d at 196–97. Thus, we will uphold the trial court's finding on this issue unless it is against the great weight and clear

preponderance of the evidence. *Id.* at 197. Here, although Tomlinson's formulation of the events is one possible characterization of events, the finding of the circuit court on this issue was not against the great weight of the evidence, and we uphold the circuit court's conclusion that the girl's actions were sufficient to give consent to enter.

¶ 37. Consent to search does not have to be given verbally. Consent may be given in non-verbal form through gestures or conduct. *Id.* (citing *United States v. Griffin,* 530 F.2d 739, 741–42 (7th Cir. 1976)); *see also United States v. Walls,* 225 F.3d 858, 862–63 (7th Cir. 2000). The girl who answered the door turned to enter the house upon the officer's request to enter—this could reasonably have been interpreted as an invitation to follow her inside. Additionally, Tomlinson was present and apparently said nothing when this occurred. Under the totality of the circumstances, the circuit court did not err when it held that the girl gave consent for the officers to enter the house.

¶ 38. Because the officers reasonably believed that the girl who let them in had the authority to consent to the limited entry, and because the girl actually did give consent for the officers to enter the house, we hold that the consent to enter the house was valid. As a result, the warrantless arrest of Tomlinson and the seizure of the bat and the mop/broom handles were both valid, and the circuit court properly allowed the State to introduce these items as evidence at trial.

### III. ADMISSION OF PRELIMINARY HEARING TESTIMONY

¶ 39. We next turn to Tomlinson's contention that the circuit court improperly declared Coleman to be an

unavailable witness, and that the circuit court violated Tomlinson's right to confrontation when it allowed the State to introduce Coleman's preliminary hearing testimony into evidence under the hearsay exception in Wis. Stat. § 908.045(1). The admissibility of former testimony is a discretionary decision of the circuit court, and we will not overturn the circuit court's decision unless it is clearly erroneous. *La Barge v. State,* 74 Wis. 2d 327, 338, 246 N.W.2d 794 (1976). Whether a defendant's right to confrontation has been violated, however, is a question of constitutional fact. *State v. Jackson,* 216 Wis. 2d 646, 655, 575 N.W.2d 475 (1998). When we review a question of constitutional fact, we adopt the circuit court's findings of historical fact, unless they are clearly erroneous, but we independently apply those facts to the constitutional standard. *Id.*

¶ 40. Tomlinson's challenge in this case requires us to examine, once more, the relationship between the hearsay rule and the constitutional right to confrontation under the Sixth Amendment to the U.S. Constitution and Article I, Section 7 of the Wisconsin Constitution. The right to confrontation and the hearsay rule with its many exceptions, serve a similar purpose: to ensure that the trier of fact has a satisfactory basis for evaluating the truthfulness of the evidence admitted in a criminal case. *State v. Bauer,* 109 Wis. 2d 204, 210, 325 N.W.2d 857 (1982). However, compliance with the hearsay rule does not absolutely insure compliance with the constitutional right to confrontation. *Ohio v. Roberts,* 448 U.S. 56, 63 (1980) (holding that the Confrontation Clause "was intended to exclude some hearsay"); *Bauer,* 109 Wis. 2d at 210. Conversely, the confrontation right is not absolute, as a literal reading of that right would essentially require the exclusion of any statement made by a declarant who was not available at trial, and would

necessarily exclude all hearsay evidence. *Roberts,* 448 U.S. at 63; *Bauer,* 109 Wis. 2d at 209. Thus, over the course of many years and many cases, courts have been repeatedly faced with situations where they have had to accommodate these two competing principles of law.

¶ 41. The basic test governing the relationship was set down by the U.S. Supreme Court in *Ohio v. Roberts,* 448 U.S. 56, and further explained by this court in *State v. Bauer,* 109 Wis. 2d 204. The threshold question in such a case is whether the evidence in question is admissible under a hearsay exception. *Id.* at 215. Obviously, if the out-of-court statement is not admissible under the statutory rules, the evidence should be excluded and there is no reason to proceed to the constitutional question. However, if the evidence is admissible under a hearsay exception, the court must go on to address the constitutional question of whether the defendant's right to confrontation has been violated. *Id.* at 210. This is done by applying a two-part test: (1) the State must have demonstrated the declarant's unavailability; and (2) the State must have shown that the hearsay evidence bears some indicia of reliability. *Roberts,* 448 U.S. at 65–66; *Bauer,* 109 Wis. 2d at 210–11.

¶ 42. In the present case, we hold that the State has met its burden on the threshold question. The State moved for admission of Coleman's preliminary hearing testimony under the hearsay exception in Wis. Stat. § 908.045(1). If the declarant is unavailable, that statute allows the admission of

> [t]estimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of another pro-

ceeding, at the instance of or against a party with an opportunity to develop the testimony by direct, cross-, or redirect examination, with motive and interest similar to those of the party against whom now offered.

Wis. Stat. § 908.045(1). According to the statute, "unavailability as a witness" includes situations in which the declarant:

> (a) Is exempted by ruling of the judge on the ground of privilege from testifying concerning the subject matter of the declarant's statement; or

> (b) Persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the judge to do so . . . .

Wis. Stat. § 908.04(1).

¶ 43. Because the witness must be statutorily "unavailable" for Wis. Stat. § 908.045(1) to apply at all, we address that statutory section first. Tomlinson argues that the circuit court erred because it did not explore the validity of Coleman's invocation of his Fifth Amendment privilege. That is, Tomlinson contends that Coleman's reason for invoking the Fifth Amendment, fear of physical harm, is not a legitimate reason for asserting the privilege. Although we agree (and the State concedes) that Coleman may not have properly invoked his Fifth Amendment privilege in this case, we do not have to answer the question, because the trial court could properly find Coleman unavailable under Wis. Stat. § 908.04(1)(b).

¶ 44. According to that section, a witness is unavailable if he "[p]ersists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the judge to do so." This was precisely what happened in this case. Coleman repeatedly pleaded the Fifth Amendment when questioned by

527

the prosecutor. The judge then ordered Coleman to answer the State's questions several times, which Coleman again refused to do by invoking the Fifth Amendment. Coleman also invoked the Fifth Amendment when the defense attorney tried to cross-examine him. Because Coleman persistently refused to testify, in light of a court order to do so, the circuit court properly declared him unavailable under Wis. Stat. § 908.04(1)(b).

¶ 45. Given that Coleman was properly declared unavailable under the statute, the next question is whether Coleman's preliminary hearing testimony meets the requirements of Wis. Stat. § 908.045. *Bauer,* 109 Wis. 2d at 215–16. We think it is clear that it does. First, the testimony was "given as a witness at another hearing of the same . . . proceeding"—the preliminary hearing for the same case. The defendant was also given "an opportunity to develop the testimony by direct, cross-, or redirect examination" at the preliminary hearing.[6] Because the requirements of Wis. Stat. §§ 908.04(1) and 908.045(1) have been met, we hold that the threshold question, whether the evidence is admissible under a statutory hearsay exception, has been satisfied.

---

[6] Coleman answered a number of questions on cross-examination at the preliminary hearing. The defendant was able to elicit, among other things, that Coleman had not called police after the incident, that he did not see the third blow with the bat because he was retreating from the scene, and that Coleman had never seen Tomlinson prior to the date of the incident.

¶ 46. Because we hold that the evidence is admissible under the statutory rules of evidence, we next address whether Tomlinson's constitutional right to confrontation has nevertheless been violated. To do this, we apply the two-part test we have previously stated: (1) whether the State has shown that the declarant is unavailable;[7] and (2) whether the hearsay evidence bears sufficient indicia of reliability. *Roberts,* 448 U.S. at 65–66; *Bauer,* 109 Wis. 2d at 210–11. Here, we hold that both parts of the test have been met.

---

[7] We apply the unavailability prong from *Ohio v. Roberts,* 448 U.S. 56 (1980), in this case because the hearsay exception at issue is one that requires that the witness be unavailable. However, we note that our holding in *State v. Bauer,* 109 Wis. 2d 204, 325 N.W.2d 857 (1982), may have been overbroad in suggesting that the unavailability determination must be made in all Confrontation Clause cases. In *White v. Illinois,* 502 U.S. 346, 357 (1992), the U.S. Supreme Court refused to apply the unavailability rule in a Confrontation Clause challenge to evidence that was admitted under the hearsay exceptions for spontaneous declarations and statements made for medical treatment. In that case, the Court noted that "there is little benefit, if any, to be accomplished by imposing an 'unavailability rule,' " in which the court would "require as a predicate for introducing hearsay testimony either a showing of the declarant's unavailability or production at trial of the declarant." *Id.* at 354–55 & n.6. The Court noted that such a broad unavailability rule would not likely "add[ ] meaningfully to the trial's truth-determining process," and would impose substantial burdens on fact-finding. *Id.* at 354. Instead, the Court held that because the evidence had "sufficient guarantees of reliability to come within a firmly rooted exception to the hearsay rule, the Confrontation Clause [was] satisfied." *Id.* at 356.

¶ 47. For the purposes of the Confrontation Clause, the State has not shown a witness is unavailable until it has made a good-faith effort to obtain the witness's presence at trial. *Roberts,* 448 U.S. at 74 (quoting *Barber v. Page,* 390 U.S. 719, 724–25 (1968)). "The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness." *Id.* at 74 (quoting *California v. Green,* 399 U.S. 149, 189 n.22 (1970)). The question is whether the witness continues to be unavailable despite a good faith effort by the prosecution to locate and present that witness. *Id.* In *Roberts,* for instance, the U.S. Supreme Court found that the prosecution had made a good faith effort to locate a witness when it sent the witness five separate subpoenas over the course of several months, and had interviewed the witness's parents, who did not know of her location. *Id.* at 75.

¶ 48. In this case, we easily conclude that the prosecution made a good faith effort to locate and present Coleman as a witness at Tomlinson's trial. The State was able to produce Coleman at the preliminary hearing, where he gave testimony, and the State personally produced Coleman again as a witness at the trial. It was only when Coleman took the stand at trial that he persistently refused to testify. When Coleman got on the stand to testify, the State tried repeatedly to get Coleman to answer questions, and, when Coleman continued to refuse to answer, the State asked the court to order Coleman to answer. Despite these attempts, Coleman continued to refuse to testify. Given these facts, we conclude that the State made a good faith effort to produce the witness, and that the first part of the test is met.

¶ 49. We now move to the second part of the test. Under the second prong, we must determine whether the admitted evidence bears sufficient indicia of reliability such that it does not violate Tomlinson's right to confrontation. This prong is in place to ensure that the trier of fact has a " 'satisfactory basis for evaluating the truth of the prior statement.' " *Id.* at 65–66 (quoting *Green,* 399 U.S. at 161). Generally, if the evidence fits within a firmly rooted hearsay exception, the reliability of the evidence can be inferred. *Id.* at 66; *Bauer,* 109 Wis. 2d at 215.

¶ 50. Here, Coleman's preliminary hearing testimony clearly contains sufficient indicia of reliability. As the U.S. Supreme Court has noted in similar cases where preliminary hearing testimony was introduced, the testimony at the preliminary hearing here was given under circumstances that closely approximated those at trial. *See Green,* 399 U.S. at 165. Therefore, the evidence is sufficiently reliable to protect Tomlinson's confrontation rights.

¶ 51. Coleman's testimony was given under oath, before a judicial tribunal, and in a setting equipped to make a judicial record. *Id.* at 165. Tomlinson was also represented by counsel at the preliminary hearing—the same attorney who later represented Tomlinson at trial. Additionally, Tomlinson's defense counsel had an opportunity to cross-examine Coleman at the preliminary hearing. During the cross-examination, the defense attorney was able to elicit information helpful to Tomlinson's defense, including the fact that Coleman did not call the police after the incident, that Coleman did not see whether Tomlinson struck Phillips a third time because he had been leaving the scene at the time, and that Coleman had been drinking on the day of the

incident. Thus, we find Tomlinson's ability to cross-examine Coleman was meaningful.

¶ 52. Under the circumstances of this case, we conclude that Tomlinson's confrontation rights were not violated. The hearsay evidence was admissible under a statutorily recognized exception, the State made a showing that the witness was unavailable, and the hearsay evidence bore sufficient indicia of reliability. Thus, we agree with the court of appeals that the circuit court properly allowed the State to admit Coleman's preliminary hearing testimony, and we affirm the court of appeals' holding on that issue.

## IV. JURY INSTRUCTION

¶ 53. Finally, we review the propriety of the jury instruction offered by the trial court with regard to the dangerous weapon penalty enhancer—specifically, that the circuit court gave the instruction, "Dangerous weapon means a baseball bat." Tomlinson argues that this jury instruction deprived him of his right to due process because the jury did not have to decide whether the State proved beyond a reasonable doubt that a baseball bat was a dangerous weapon. Whether a jury instruction from the circuit court deprives a defendant of his right to due process is a question of law, which we review de novo. *State v. Kuntz,* 160 Wis. 2d 722, 735, 467 N.W.2d 531 (1991).

¶ 54. Tomlinson and the State both appear to concede that the jury instruction on the dangerous weapon element was erroneous, and focus their arguments primarily on whether or not Tomlinson adequately waived his right to a jury trial. While we agree with the presumption that the jury instruction was

erroneous, we hold that the error was harmless as it was committed in this case. Thus, we affirm the court of appeals' ultimate decision on this issue, albeit on different grounds, and we do not reach the question of waiver.[8]

¶ 55. It is well-established that to convict a criminal defendant, the State must prove all elements of a crime beyond a reasonable doubt.[9] *Id.* at 736 (citing *Muller v. State,* 94 Wis. 2d 450, 473, 289 N.W.2d 570 (1980)). Thus, an evidentiary presumption in a jury instruction may have the effect of relieving the State of this obligation. *Id.* (citing *Muller,* 94 Wis. 2d at 473–74). As we have previously held, when the circuit court instructs the jury that it must find the elemental fact if the State proves certain other predicate facts, the State might be relieved of its burden of persuasion because the element will be removed from the jury entirely if the State proves the predicate facts. *Id.* at 736–37. Thus, we have generally held that a mandatory presumption in a jury instruction is impermissible. *Id.* at 737.

¶ 56. In *State v. Kuntz,* we were presented with a jury instruction error similar to the one here. In that case, the defendant was on trial for arson, which

---

[8] The parties' waiver arguments primarily involve reconciling the present case with *State v. Villarreal,* 153 Wis. 2d 323 (Ct. App. 1989), and *State v. Benoit,* 229 Wis. 2d 630 (Ct. App. 1999). We mention these cases only to emphasize that we do not interpret either of the two cases as limiting the harmless error rule's application to erroneous jury instructions.

[9] The parties do not dispute the fact that the dangerous weapon penalty enhancer constitutes an element of the charged crime. *See State v. Carrington,* 134 Wis. 2d 260, 268–70, 397 N.W.2d 484 (1986).

requires, as an element, that a "building" be damaged by fire. *Id.* at 734; *see also* Wis. Stat. § 943.02; Wis JI—Criminal 1404 (1992). The alleged arson had occurred in a mobile home, and in instructing the jury, the circuit court stated, " '[a] mobile home is a building.' " *Kuntz,* 160 Wis. 2d at 734. Kuntz challenged this instruction on the grounds that it deprived him of due process by not requiring the State to prove that element of the crime beyond a reasonable doubt. *Id.* at 733–34.

¶ 57. We held that the jury instructions, as given, created a mandatory conclusive presumption regarding an element of the arson offense, and were therefore erroneous. *Id.* at 735. However, we went on to hold that the mandatory conclusive presumption was harmless error because it did not play a role in the jury's verdict. *Id.* In that case, we applied the reasoning of Justice Scalia's concurrence in *Carella v. California,* 491 U.S. 263, 267–73 (1989) (Scalia, J., concurring), to hold that the jury instructions, as given, still left it up to the jury to determine whether or not the structure in question was a mobile home. *Id.* at 740. We concluded that no rational jury could possibly have found that the structure in question was a mobile home without also finding that it was a building, and thus the error was harmless. *Id.*

¶ 58. Cases subsequent to *Kuntz* have called into question the viability of Justice Scalia's *Carella* concurrence, and thus have also called into question our analytical framework in *Kuntz. See Neder v. United States,* 527 U.S. 1, 13–14 (1999); *State v. Harvey,* 2002 WI 93, ¶ 43–45, 254 Wis. 2d 442, 647 N.W.2d 189. However, they have affirmed the bottom line in both cases: the use of harmless error analysis is appropriate in the case of an erroneous jury instruction.

¶ 59. In the U.S. Supreme Court's decision in *Neder,* 527 U.S. 1, the Court stated that unlike consti-

tutional violations which "affect[] the framework within which the trial proceeds," errors in jury instructions—which in *Neder*, was the omission of an entire element—do not *necessarily* render a criminal trial fundamentally unfair or unreliable, and are therefore subject to harmless error analysis. *Id.* at 8–9. The Court declined to apply the more restrictive framework in the *Carella* concurrence, instead articulating the test for harmless error as "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " *Id.* at 15 (quoting *Chapman v. California*, 386 U.S. 18 (1967)). However, the bottom line of *Carella*—the applicability of harmless error to an erroneous jury instruction—remained unchanged.

¶ 60. This term, in *Harvey*, 2002 WI 93, ¶ 35, we adopted the *Neder* rule for harmless error. In that case, we assessed a jury instruction in which the court took judicial notice that Madison's Penn Park was a "city park" for the purposes of a penalty enhancer, and instructed the jury that they must accept that fact as true. *Harvey*, 2002 WI 93, ¶¶ 10–12. We held that, under *Neder*, it was clear beyond a reasonable doubt that a properly instructed, rational jury would have found the defendant in that case guilty of the enhancer even if it had been properly instructed that it may, but need not accept the judicially noticed fact as true. *Id.* at ¶ 47.

¶ 61. The *Neder* rule is equally appropriate in this case. Under the harmless error rule, we must ask if it appears " 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained . . . .' " *Harvey*, 2002 WI 93, ¶ 44 (quoting *Neder*, 527 U.S. at 15–16). We hold that the test is met here.

¶ 62. In this case, the court instructed the jury, "A dangerous weapon is a baseball bat." This is clearly a mandatory conclusive presumption because it requires the jury to find that Tomlinson used a "dangerous weapon" for the purpose of the sentence enhancer if it first finds the predicate fact that he used a baseball bat to commit the homicide. As a mandatory conclusive presumption, the jury instruction is presumed to be erroneous. However, we think it is clear, beyond a reasonable doubt that, absent the error, any rational jury would have come to the same conclusion.

¶ 63. To be a "dangerous weapon" an object must be

> any firearm, whether loaded or unloaded; any device designed as a weapon and capable of producing death or great bodily harm; any electric weapon, as defined in s. 941.295 (4); or any other device or instrumentality which, in the manner it is used or intended to be used, is calculated or likely to produce death or great bodily harm.

Wis. Stat. § 939.22(10). A baseball bat, when used to strike another person, and particularly when used to strike another person in the head, would without question qualify as a "device . . . which, in the manner it is used . . . is calculated or likely to produce death or great bodily harm." If the court had given a proper instruction—that the jury must find, beyond a reasonable doubt, that a baseball bat is a "dangerous weapon" under this statutory definition—any rational jury would have come to the conclusion that it was, and thus would have reached an identical verdict to the one it reached in this case.

¶ 64. We agree that the mandatory conclusive presumption given in the jury instructions by the circuit court in this case did constitute error. However,

536

because we are convinced beyond a reasonable doubt that the error did not play any role in the jury's verdict, we hold that the erroneous instruction was harmless. Therefore, we affirm the decision of the court of appeals on this issue.

## V. CONCLUSION

¶ 65. In conclusion, we agree with the conclusion of the circuit court and court of appeals on all three issues. First, the police properly received consent to enter Tomlinson's house, and the circuit court properly refused to suppress the evidence of the baseball bat and the broom/mop handles. Second, the circuit court correctly admitted the preliminary hearing testimony of Otis Coleman, and did not violate Tomlinson's right to confrontation. Finally, although we hold that the circuit court erred in issuing a mandatory conclusive presumption in its jury instructions for the dangerous weapon sentence enhancer, we also hold that the error was harmless. Therefore, we affirm the decision of the court of appeals and uphold Tomlinson's conviction.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 66. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE *(dissenting).* I dissent for the reasons set forth in my dissent in *State v. Harvey*, 2002 WI 93, 254 Wis. 2d 442, 647 N.W.2d 189, also released today.

¶ 67. I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.