STATE of Wisconsin, Plaintiff-Respondent,

v.

Paul Dwayne WESTMORELAND,
Defendant-Appellant.†

Court of Appeals

*No. 2007AP929–CR. Submitted on briefs November 30, 2007.
—Decided December 27, 2007.*

2008 WI App 15

(Also reported in 744 N.W.2d 919.)

† Petition to review denied 3/18/08.

On behalf of the defendant-appellant, the cause was submitted on the brief of *Joseph E. Redding* of *Glojek Limited,* West Allis.

On behalf of the plaitniff-respondent, the cause was submitted on the brief of *J.B. Van Hollen,* attorney general, and *Michael C. Sanders,* assistant attorney general.

Before Curley, P.J., Fine and Kessler, JJ.

¶ 1. FINE, J. Paul Dwayne Westmoreland appeals a judgment and a corrected judgment entered on jury verdicts finding him guilty of first-degree intentional homicide with a dangerous weapon, *see* WIS. STAT. §§ 940.01(1)(a), 939.63, two counts of first-degree reck-lessly endangering safety with a dangerous weapon, *see* WIS. STAT. §§ 941.30(1), 939.63, and possessing a fire-arm as a felon, *see* WIS. STAT. § 941.29(2). He also appeals the trial court's order denying his motion for postconviction relief without a hearing. His sole conten-tion on appeal is that his trial lawyer ineffectively represented him when she argued alternative and in-consistent theories in her closing argument. We affirm because as a matter of law the closing argument by Westmoreland's lawyer was, in the context of this case, a matter of strategy, to which, as explained below, we owe considerable deference.

## I.

¶ 2. Westmoreland was accused of shooting and killing Genecy Joyner, and shooting Kelvon Rederford and a juvenile, Robert K. B., Jr., in September of 2004.

432

As we show below, both living victims, Rederford and Robert, testified at the trial that they saw Westmoreland shoot Joyner. Further, Rederford told the jury that Westmoreland shot him.

¶ 3. This case has its roots in Westmoreland's belief that both Rederford and his brother-in-law, Joyner, were implicated in the murder of his friend, Dale Williams, a week earlier. According to Rederford, Westmoreland and some others approached Rederford in a Milwaukee neighborhood and asked about Dale Williams's murder. Sensing that Westmoreland was angry, Rederford asked him " '[w]hat's wrong?' " Westmoreland replied: " 'My guy dead, somebody know something.' " After repeating that he thought the others knew what had happened to Dale Williams, Westmoreland, according to Rederford, "pulled his gun," and "aimed at" Joyner, who "put his hands up" saying, " 'Wayne, no, man.' " Rederford testified that Westmoreland "shot at [Joyner] anyway," and then turned to shoot Rederford. Rederford was hit in his arm and fell to the ground.

¶ 4. Rederford testified that after Westmoreland shot him, Westmoreland chased Joyner "shooting him." As Rederford got up and ran away, he "just kept hearing shots." Westmoreland's trial lawyer asked how Rederford could be certain that Westmoreland was the one shooting at Joyner when he, Rederford, was running away:

> Q So you're not watching or you're not seeing what else is going on?
>
> A As I fell to the ground and my brother-in-law take off running, he [Westmoreland] take off running behind my brother-in-law shooting him. I could see that. You ain't talking to no dummy. Come on now.

The jury was told that Rederford had been convicted of two crimes as an adult and one as a juvenile.

¶ 5. Robert K. B., Jr., also testified that he saw Westmoreland shoot Joyner, who was the boy's cousin. Although he, too, was shot, he could not identify, other than by a description, the person who had done it. Kenneth Branch, who told the jury that Robert was his "little godcousin," testified that he was in the area and heard "[s]ix to seven shots" when he "hit the ground" in response. He said that he saw Westmoreland chasing Robert, who was riding a bicycle, and "[s]hootin' [sic] at him." He also told the jury that Westmoreland was the only person of the group in the area during the incident whom he saw with a gun. Branch admitted that he had five adult criminal convictions and one as a juvenile.

¶ 6. Willie Staten, who said that he was Joyner's cousin, was also in the area during the incident and testified that he saw the confrontation between Westmoreland and Joyner. He told the jury that Westmoreland pointed a gun at Joyner's face and he heard, but did not see, shots. He did, however, see Joyner "running" and that "after he fell that's when I seen [sic] the defendant walk — walk up to him, get to shooting him again."

¶ 7. Tina Williams also implicated Westmoreland in the shootings. She told the jury that she was in her house when she heard shots from the street. Concerned about her children who were playing outside, she went outside and saw Westmoreland running down the street with a handgun.

¶ 8. The jury also heard that after first denying that he had anything to do with the shootings, Westmoreland ultimately admitted to the police that he had fired shots, but contended that he did not intend to kill anyone. The detective who wrote the statement that

434

Westmoreland signed, and which was received into evidence, read it to the jury.

¶ 9. According to the detective, Westmoreland said that he had asked Rederford and Joyner if they knew who had killed Dale Williams. When he was nòt, apparently, getting satisfactory answers, Westmoreland admitted that he became "upset and noticed a large crowd and [*sic*—"had"?] gathered around" them. Westmoreland told the detective that he was concerned about the crowd, and tried to disperse it: "Westmoreland stated that he, Westmoreland, pulled out a nickel plated nine millimeter pistol with a black handle from the left front side of his waistband of his pants. He stated he did this to get the crowd to move away." Westmoreland told the detective that after two men told him to put the gun away, he "turned and began firing the pistol to move the crowd away." Westmoreland said that he had heard Joyner tell him to stop, and, after that, "he, Westmoreland, turned to run and fired three more times. He stated he believes he fired about nine times in total." Westmoreland also told the detective that "as far as he knows, no one else had a gun, and he did not see anyone else with a gun" there during the incident. He said that he did not know anyone had been shot until later, when a friend of his told him. He had earlier told the police that he first learned of the shooting from the television news.

¶ 10. The State also called Edmond Cornelius Young as a witness. Young had been in prison with Westmoreland after the shootings, and he told the jury that Westmoreland had admitted his involvement. According to Young, Westmoreland told him that he, Westmoreland, shot Joyner "in the back three times and when he fell, he run [*sic*] up on him and shot him two more times." The jury learned that Young had three adult criminal convictions.

435

¶ 11. As was his right, Westmoreland neither testified nor called any witnesses in his defense. Nevertheless, in her opening statement to the jury, Westmoreland's trial lawyer told the jury flat out that Westmoreland "was not involved" in any of the shootings, and that, apparently referring to the statement in which Westmoreland said that he shot into the crowd to disperse it but that he did not intend to hurt anyone, "he confessed to a crime that he did not commit." She also told the jury that it would have to assess the credibility of the various witnesses "and decide for yourself" if the witnesses implicating Westmoreland were credible, but "I believe, and I submit to you that the evidence will show, that these people are not believable."

¶ 12. In her closing argument, Westmoreland's lawyer again told the jury that Westmoreland was not involved in the shootings and that the witnesses who said that he was were "patently incredible" and were infected by bias because: many of them were relatives of the victims; three had prior criminal convictions; and the witnesses were not able to see much of what they told the jury they saw. She also contended that Westmoreland's statement to the police was coerced, despite the trial court's earlier ruling that it was not, a ruling that Westmoreland does not dispute on this appeal.

¶ 13. After in essence repeating her opening statement's contention that Westmoreland was falsely accused and was not involved in the shootings, his lawyer turned tack in her summation to argue that he was guilty of the lesser-included crime of first-degree reckless homicide, on which the trial court without objection and in accord with Westmoreland's request had already instructed the jury.

> Now, I feel really weird about this, and I don't know how to state it more articulately, but I want you for a

second to set aside what I just said, and I feel like a turncoat, and I'm going to step over here to the other side of the podium, okay?

I've just told you that my client is not guilty as to all of these charges, but the law requires me to make another argument in this instance, and that is regarding the homicide in this case.

If you believe that my client was involved in this incident, then he's being charged with the wrong crime.

The State is seeking a — a conviction here on a charge of first degree intentional homicide, but the Judge, again, in her packet of instructions, which you're gonna [sic] get, told you that you have the opportunity to consider a lesser charge in this instance, that being a charge of first degree reckless homicide.

And I want to talk to you for a minute about why Mr. Westmoreland is not guilty of first degree intentional homicide, and why you have to consider the possibility of the first degree reckless homicide, okay?

She then discussed the difference between the two charges.

¶ 14. On his rebuttal argument, the prosecutor said that Westmoreland's lawyer was "talking out of both sides" of her mouth:

Part of what she's saying is, well, he didn't do it; and then part of what she's saying is, well, if he did do it, then you should find him guilty of something less. So she's talking out of both sides of her mouth, and that's the whole point, here.

¶ 15. As noted, the jury found Westmoreland guilty of first-degree intentional homicide for shooting Joyner, and Westmoreland contends that his lawyer was ineffective because she argued inconsistent theories.

437

## II.

¶ 16. To prove ineffective assistance of counsel, a defendant must show: (1) deficient performance by his or her lawyer; and (2) prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prove deficient performance, the defendant must point to specific acts or omissions of the lawyer that are "outside the wide range of professionally competent assistance." *Id.*, 466 U.S. at 690. There is a "strong presumption that counsel acted reasonably within professional norms." *State v. Johnson*, 153 Wis. 2d 121, 127, 449 N.W.2d 845, 848 (1990).

¶ 17. To satisfy the prejudice aspect of *Strickland*, the defendant must demonstrate that the lawyer's errors were sufficiently serious to deprive him or her of a fair proceeding and a reliable outcome. *Strickland*, 466 U.S. at 687, 694. ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.").

¶ 18. Conclusions by the trial court whether the lawyer's performance was deficient and, if so, prejudicial, present questions of law that we review *de novo*. *Johnson*, 153 Wis. 2d at 128, 449 N.W.2d at 848. Finally, we need not address both *Strickland* aspects if the defendant does not make a sufficient showing on either one. *Strickland*, 466 U.S. at 697.

¶ 19. As we have seen, Westmoreland claims that his lawyer ineffectively represented him by arguing

438

inconsistent theories in her summation. He *does not* claim, however, and therefore we do not address, whether his lawyer was ineffective for arguing that Westmoreland was "not involved" in the shooting at all. *See State v. Allen*, 2004 WI 106, ¶ 26 n.8, 274 Wis. 2d 568, 587 n.8, 682 N.W.2d 433, 442 n.8 (issue not argued is waived). Indeed, Westmoreland argues on appeal that his trial lawyer should have taken "an all-or-nothing approach" and should not have argued the lesser-included-crime instruction given by the trial court at Westmoreland's request. As noted, Westmoreland does not challenge on this appeal either the trial court's giving that instruction or his lawyer's effectiveness for having asked for it. Thus, as with the wisdom of arguing that Westmoreland was not involved in the shootings, we do not discuss these matters. *See ibid.*

¶ 20. We start with the proposition that strategic decisions by a lawyer are virtually invulnerable to second-guessing. *Strickland*, 466 U.S. at 690. As the trial court recognized, we must analyze the change of tack by Westmoreland's lawyer in her summation against the evidence as it existed at that time, not as she might have hoped she could have accomplished when she gave her opening statement. At that point, sticking with the all-or-nothing approach set out in her opening statement would have been largely suicidal. Thus, we agree with the trial court's conclusion in its decision denying Westmoreland's motion for postconviction relief "that it was a reasonable trial strategy for counsel to argue an alternative defense based on reckless conduct."

¶ 21. Westmoreland points to two Wisconsin cases that hold that a lawyer is not ineffective for *not* arguing inconsistent theories. *See State v. Kimbrough*, 2001 WI

439

App 138, ¶¶ 1, 32, 246 Wis. 2d 648, 653, 665, 630 N.W. d 752, 754, 760; *State v. Eckert*, 203 Wis. 2d 497, 510, 5 3 N.W.2d 539, 544 (Ct. App. 1996) (decision to not requ t a lesser-included-crime instruction). But this is a diff - ent matter from saying that a lawyer *is* ineffective r doing so. As *Strickland* reminds us, there is a "w range of professionally competent assistance," *id.*, 4 U.S. at 690, and the bar is not very high, *see Yarboroug v. Gentry*, 540 U.S. 1, 11 (2003) (lawyer need not be Clarence Darrow to survive an ineffectiveness contention). Indeed, it is not uncommon for lawyers to argue inconsistent defenses. *See, e.g., State v. Nelis*, 2007 WI 58, ¶ 20, 300 Wis. 2d 415, 424, 733 N.W.2d 619, 623 ("Nelis argued at trial that the evidence did not show that he and Diane S. had sexual intercourse on the night at issue. He further argued that, even if they did have sexual intercourse that night, it was consensual.").

■

¶ 22. What Westmoreland's trial lawyer did here was within the "wide range of professionally competent assistance," *see Strickland*, 466 U.S. at 690, and, given the overwhelming strength of the State's case, was "strategy" as a matter of law. Further, as the trial court also concluded, given the strength of the State's case, persisting with the original all-or-nothing approach would not have led reasonable jurors to conclude that the State had not proven Westmoreland guilty beyond a reasonable doubt. Thus, as a matter of law there was also no *Strickland* "prejudice," that is, the change of tack by Westmoreland's lawyer in her closing argument did not "undermine confidence" in the trial's outcome. *See Strickland*, 466 U.S. at 694. Accordingly, we affirm.[1]

---

[1] Westmoreland also contends that his trial lawyer was wrong when she prefaced her change of tack in her closing

*By the Court.*—Judgment, corrected judgment, and order affirmed.

argument by telling the jury that "the law requires me to make another argument in this instance" because the law *did not* "require[]" her to make an argument inconsistent with her contention that Westmoreland was not involved in the shootings. This is a non-starter because the lawyer's preface *helped* rather than *hurt* Westmoreland—it reduced, rather than enhanced, whatever prejudice might have flowed as a result of the lawyer's giving the jury an alternative, albeit inconsistent, argument, especially since the trial court had already instructed the jury that it could consider the lesser-included crime of first-degree reckless homicide. As we have already seen, Westmoreland does not challenge the propriety of that instruction or the effectiveness of his trial lawyer for asking for it. Thus, we do not discuss it. *See State v. Allen*, 2004 WI 106, ¶ 26 n.8, 274 Wis. 2d 568, 587 n.8, 682 N.W.2d 433, 442 n.8 (issue not argued is waived).