COURT OF APPEALS
DECISION
DATED AND FILED

February 26, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP1101**

STATE OF WISCONSIN

Cir. Ct. No. 2022TP66

IN COURT OF APPEALS
DISTRICT II

---

IN RE THE TERMINATION OF PARENTAL RIGHTS TO J.R.Q. JR., A PERSON UNDER THE AGE OF 18:

KENOSHA COUNTY DIVISION OF CHILDREN & FAMILY SERVICES,

    PETITIONER-RESPONDENT,

  V.

K.E.H.,

    RESPONDENT-APPELLANT.

---

APPEAL from an order of the circuit court for Kenosha County: JODI L. MEIER, Judge. *Affirmed*.

¶1 LAZAR, J.[1] Kara appeals an order terminating her parental rights to Josh, a child born in 2020, on the basis that her trial attorney provided ineffective assistance of counsel during her grounds phase jury trial.[2] She asserts her trial counsel (1) failed to adequately prepare for trial; (2) failed to keep the issues of Josh's best interests and the "value of permanency" for him out of the case; and (3) erroneously elicited detrimental testimony that opened the door to information about Josh's sibling (Caleb) and that child's CHIPS[3] case. Based upon the cumulative effect of her attorney's alleged ineffective assistance, Kara claims she was prejudiced and that the denial of her postconviction motion should be reversed, the order terminating her parental rights should be vacated, and the matter should be remanded to the trial court. This court disagrees.

## BACKGROUND

¶2 Josh, Kara's second child, was born in November, 2020. Even prior to Josh's birth, Kara had been involved with Kenosha County Department of Children and Family Services due to concerns about the safety of Josh's older brother, Caleb; the County had received reports that Kara had been "under the influence" while caring for the child. When Josh was born, he had traces of Kara's prescription drugs in his system.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version unless otherwise noted.

[2] In order to protect her confidentiality, pursuant to WIS. STAT. RULE 809.19(1)(g), this court refers to the mother of the child by the pseudonym she selected. The child who is involved in this appeal is referred to by the pseudonym Josh; her other child is referred to by the pseudonym Caleb.

[3] CHIPS stands for child in need of protection or services. *See* WIS. STAT. § 48.13.

¶3 On May 21, 2021, Kara attended a court hearing for Caleb. Kara asserts that, due to stress, she took a double dose of her prescribed Xanax that day. A Kenosha County service provider who had been Kara's Alcohol and Other Drug Abuse (AODA) assessment provider noticed the effect of that drug on Kara. After the hearing, Kara called her mother (who was caring for the two boys) and then called 911 because she "passed out," her "ears … started ringing," and she "couldn't see." She was admitted to the hospital for at least one day during that weekend. Kara's overdose and contact with 911/law enforcement was reported to her County Child Protection Services (CPS) worker, Allen Smith.

¶4 Josh was detained by Kenosha County Juvenile Intake Services on the following Monday, May 24, 2021, after Smith was unable to contact Kara that weekend. The County filed a CHIPS petition on May 28, 2021. On September 2, 2021, Josh was found to be in need of protection or services pursuant to WIS. STAT. § 48.13(10m) and was placed outside of Kara's home starting on November 2, 2021. Conditions required for Josh's return were set out in dispositional and permanency orders and verbally given to Kara in court on November 2, 2021, November 17, 2021, and June 28, 2022. The County filed a petition to terminate Kara's parental rights to Josh on December 14, 2022, on the grounds that (1) he continued to be in need of protection or services pursuant to WIS. STAT. § 48.415(2), and (2) Kara had failed to assume parental responsibility for Josh pursuant to § 48.415(6).[4]

---

[4] The County also sought to terminate Josh's father's parental rights on the same grounds. On April 19, 2023, the father was found to be unfit by default and his parental rights were subsequently terminated after a best-interest hearing on September 18, 2023; his parental rights to Josh are not a subject of this appeal.

¶5      Likely due to staffing issues, it wasn't until April 3, 2023, that the State Public Defender's office appointed Brenda VanCuick, an attorney with over twenty years of experience—at least seventeen of which involved child protection and termination of parental rights (TPR) cases—to represent Kara.  In the ensuing month, attorney VanCuick filed a demand for discovery and successfully sought a judicial substitution.

¶6      VanCuick obtained discovery that covered both Josh and Caleb.  It consisted of approximately 2,000-3,000 pages on a flash drive.  She reviewed the materials related to Josh and skimmed through the files related to Caleb.  As further trial preparation, VanCuick met with two of the service provider witnesses listed by the County.  Both individuals mentioned some favorable comments about Kara that VanCuick hoped to elicit during the trial.

¶7      The matter was set for a jury trial on July 31, 2023, to determine whether there were grounds for terminating Kara's parental rights.[5]  *See* WIS. STAT. § 48.424(1).  After a July 27 jury status hearing, VanCuick met in person with Kara for between one and two hours; on the Sunday prior to the jury trial, VanCuick again met with Kara for over three hours.

¶8      The grounds-phase jury trial lasted six days and concluded on August 7, 2023.  In addition to seven witnesses called by the County, Kara also testified.  Ultimately, the jury returned verdicts against Kara on both of the

---

[5]  A termination of parental rights case "involve[s] a two-step process."  ***Tammy W-G. v. Jacob T.***, 2011 WI 30, ¶18, 333 Wis. 2d 273, 797 N.W.2d 854.  The first step is the factfinding hearing on grounds for termination.  ***Id.***  "The second-step, the dispositional hearing, occurs only after the fact-finder finds a … ground has been proved and the court has made a finding of [parental] unfitness."  ***Id.***, ¶19.  It is in the second step that the court considers the best interest of the child.  ***Id.***

County's asserted grounds (Child in Continuing Need of Protection or Services and Failure to Assume Parental Responsibility).

¶9     The second phase of the TPR case—the dispositional hearing regarding Josh's best interests—took place on September 18, 2023.  The trial court concluded that it was in Josh's best interest that Kara's parental rights be terminated.  Following entry of an order to that effect, Kara obtained appellate counsel and filed a postdisposition motion for a new trial.  Kara asserted that she had received ineffective assistance of counsel because Attorney VanCuick failed to prepare for her trial, permitted the introduction of evidence related to Josh's best interests at the grounds-phase trial, and "did not grasp the prejudice inflicted by evidence pertaining to Caleb's removal from Kara's home or the CHIPS case that followed."

¶10     On September 26, 2024, the trial court held a ***Machner***[6] hearing at which VanCuick testified.  In addition to explaining her preparation as recounted above, she responded to questioning regarding each incident that Kara alleged constituted deficient performance.  For example, relevant to VanCuick's decision not to object to certain statements in opening and closing arguments during the grounds-phase trial about the value of permanence for Josh, VanCuick testified that objecting during opening and closing arguments "actually draw[s] more attention to whatever was said and the jury will … take notice."

¶11     Kara had also relied on the fact that in her own closing argument, VanCuick misstated that Kara had illegally purchased and used Methadone, rather

---

[6] ***State v. Machner***, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

5

than the similar drug Suboxone, which Kara had actually used. Kara argued that the County "seized on" this error in rebuttal, suggesting that she bought Methadone in addition to Suboxone. VanCuick testified that this was not intentional, but rather accidental:

> Complete slip of the tongue and I didn't even realize that I said Methadone instead of Suboxone. I didn't realize that I said it so much so that when the [County] came up with their rebuttal and discussed ... the things that they did about Methadone and Suboxone ... I think [Kara] and I were both looking at each other like, what? Where did that come from?

¶12 Finally, Kara had taken issue with the fact that there were various lines of testimony as to whether she had suffered an overdose or there was simply an adverse reaction to the Xanax she had taken on May 21 and criticized VanCuick for eliciting unfavorable testimony that the incident was, in fact, an overdose. VanCuick explained:

> Well, in my experience I was a firefighter for 27 and a half years here in the city. Many of the calls that we went on in my last I'll say five years were overdoses and an overdose call in my medical experience is someone who's not conscious. Barely breathing. That we have to give some type of medication or intervention to in order to get them back into a normal range of vital signs.
>
> So in -- in my experience with overdoses and what's considered an overdose I -- I would say that what [Kara] experienced … would have been considered a -- an allergic reaction or -- or something of that nature.

¶13 During its oral ruling on October 18, 2024, the trial court first considered VanCuick's trial preparation. It noted that VanCuick looked over the "lengthy discovery," even though she focused more on Josh's notes, not Caleb's, that she had lengthy in-person meetings with Kara, and that she had pre-trial discussions with two of the service provider witnesses. It also did not consider her

6

failure to call an expert on "the meaning of overdose" to be the product of a lack of preparation:

> Attorney VanCuick is a professional. She's extremely experienced in these areas. She's been successful in trials in this area before so I don't find anything deficient about her trial strategy based upon her explanations.
>
> I accept her explanations. I shouldn't say trial strategy. Trial preparation. Excuse me. So I -- I don't find that ... she failed to prepare for trial in an acceptable fashion.

¶14    With respect to alleged deficiencies during the jury trial, the trial court found that VanCuick had philosophical or strategic reasons for not objecting during opening statements and closings, that her saying "Methadone instead of Suboxone" during closing was simply a mistake and there was no showing that the jury relied upon it to Kara's detriment, that it is the "nature of the beast of trial really" that an attorney may miss a statement or two by a witness, that she was attempting to elicit favorable testimony from the two service provider witnesses only to have them answer in unexpected ways, and that VanCuick's questioning that opened the door to testimony about Caleb was not intentional, but rather the result of poor questioning in a case where there is more than one child involved. The court thus concluded that VanCuick's trial performance was not deficient, but rather was "within the wide range of reasonable, professional assistance":

> I don't see anything deficient about overall ... what Attorney VanCuick did. Not to say that she didn't perhaps make that mistake about Suboxone or Methadone, but I didn't -- again, it's not evidence anyway. It was in closing and the jury was properly instructed about that.
>
> The strategic trial decision in Attorney VanCuick's explanations on most of the things were rationally based on the facts of this case, the circumstances of the case, and if it's based on facts and the law it's not ineffective assistance of counsel.

> It -- we can disagree with it. We can look back and say, perhaps this should have been done or this should not have been done, but assistance even if it's deficient in the sense that counsel could have done better, doesn't mean it's in and of itself constitutionally ineffective.
>
> As I've stated before it's typical for evidence in the course of a trial especially a lengthy one not to come in as expected for each side. For both sides, but the proper standard of judging attorney performance is that of reasonably effective assistance considering all of the circumstances.

¶15    Given its conclusion that there was no ineffective assistance of counsel, the trial court declined to address whether there was any prejudice. Nevertheless, the court noted:

> I didn't hear any testimony … that she missed something that would have been extremely helpful in the case notes to [Kara]'s case as it related to again [Caleb's] case notes or there was some critical piece of evidence that didn't get presented because Attorney VanCuick missed that.

¶16    Kara appeals.

## DISCUSSION

¶17    It is well settled that criminal defendants are constitutionally guaranteed the right to the assistance of competent counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984). This fundamental right is also applicable in Wisconsin to parents in termination of parental rights cases. *State v. Shirley E.*, 2006 WI 129, ¶¶30-31, 298 Wis. 2d 1, 724 N.W.2d 623; WIS. STAT. § 48.23(2). The "statutory provision for appointed counsel [to parents in a CHIPS proceeding] includes the right to *effective* counsel." *A.S. v. State*, 168 Wis. 2d 995, 1004-05, 485 N.W.2d 52 (1992).

¶18    "The benchmark for judging any claim of ineffective assistance of counsel is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *State v. Jenkins*, 2014 WI 59, ¶34, 355 Wis. 2d 180, 848 N.W.2d 786. The two-prong test to be used by the trial court was set forth in *Strickland* and adopted in Wisconsin in *State v. Mayo*, 2007 WI 78, ¶¶33, 60, 301 Wis. 2d 642, 734 N.W.2d 115. "First, the [party] must demonstrate that counsel's performance was deficient." *Id.*, ¶33. "Second, the [party] must demonstrate that counsel's deficient performance was prejudicial to his or her defense." *Id.* In essence, "[a party] who alleges that counsel was ineffective by failing to take certain steps must show with specificity what the actions, if taken, would have revealed and how they would have altered the outcome of the proceeding." *State v. Prescott*, 2012 WI App 136, ¶11, 345 Wis. 2d 313, 825 N.W.2d 515 (quoting *State v. Byrge*, 225 Wis. 2d 702, 724, 594 N.W.2d 388 (Ct. App. 1999), *aff'd*, 2000 WI 101, 237 Wis. 2d 197, 614 N.W.2d 477).

¶19    The party asserting an ineffective assistance of counsel claim bears the burden of proof as to both of the *Strickland* analysis prongs. *See State v. Romero-Georgana*, 2014 WI 83, ¶¶39-41, 360 Wis. 2d 522, 849 N.W.2d 668; *State v. Hudson*, 2013 WI App 120, ¶11, 351 Wis. 2d 73, 839 N.W.2d 147. This court "need not address both the performance and the prejudice elements, if the [party] cannot make a sufficient showing as to one or the other element." *Mayo*, 301 Wis. 2d 642, ¶61; *State v. Tomlinson*, 2001 WI App 212, ¶40, 247 Wis. 2d 682, 635 N.W.2d 201, *aff'd*, 2002 WI 91, 254 Wis. 2d 502, 648 N.W.2d 367.

¶20    When reviewing trial counsel's performance, this court gives great deference to counsel and every effort must be made to avoid a determination of

9

ineffectiveness based upon hindsight. ***State v. Reynolds***, 206 Wis. 2d 356, 363, 557 N.W.2d 821 (Ct. App. 1996). "Rather, the case is reviewed from counsel's perspective at the time of trial, and the burden is ... on the [appellant] to overcome a strong presumption that counsel acted reasonably within professional norms." ***Id.*** (citation omitted). Constitutional ineffective assistance "is a mixed question of fact and law." ***State v. McDowell***, 2004 WI 70, ¶31, 272 Wis. 2d 488, 681 N.W.2d 500. And, while this court "will not disturb the [trial] court's findings of fact unless they are clearly erroneous," whether defense counsel's performance was constitutionally ineffective is a question of law to be reviewed de novo. ***Id.***; ***State v. Pitsch***, 124 Wis. 2d 628, 634, 369 N.W.2d 711 (1985).

¶21    In this appeal, Kara's claim for ineffective assistance of counsel is based upon three alleged errors by her attorney: (1) failure to prepare for the jury trial; (2) failure to object to arguments that mentioned the value of permanency for Josh; and (3) elicitation of detrimental testimony about Caleb and his CHIPS case. Kara asserts that these errors were prejudicial because the jury heard about Josh's best interests and what should happen next and because VanCuick "made too many objectively unreasonable errors, too many mistakes that hurt [Kara's] chances by muddying the evidentiary waters with prejudicial material, to produce trustworthy verdicts." None of these arguments merit a reversal.

### I.    Trial counsel adequately prepared for trial.

¶22    Kara contends that "VanCuick's gravest error ... was her failure to prepare." Kara argues that the two pretrial preparation meetings amounted to minimal communication. She further contends VanCuick did not thoroughly review the discovery materials and was thereby not prepared to conduct "productive examinations" or make careful arguments. Finally, Kara asserts

10

VanCuick's misstatement in closing regarding Methadone further evidenced an underprepared lawyer.

¶23     At the *Machner* hearing, Attorney VanCuick refuted the assertion that she was not adequately prepared for Kara's jury trial. She explained that she was not counsel in the case regarding Caleb, so—aside from the material on the discovery flash drive—she did not have access to his files (CHIPS and TPR). The trial court had questioned her preparedness at trial based on her unfamiliarity with Caleb's files, suggesting that VanCuick had not done her due diligence or reviewed sufficient discovery.[7]     But, during the *Machner* hearing, the court concluded that VanCuick's trial preparation was, in fact, acceptable.

¶24     While it certainly is true that VanCuick could have asked for voluminous explanations about the data storage system regarding Caleb, she fully explained that she was knowledgeable as to the files and materials about Josh. This raises the interesting question as to how much an attorney in a TPR case should investigate cases of related children. The key issue, though, is whether the County has proven that *this parent* is unfit to care for *this child*. And, that was the issue VanCuick prepared to argue during the trial. She drafted cross-examination questions she believed would elicit favorable testimony. In addition, VanCuick testified that her two lengthy meetings with Kara were not the only times they communicated; VanCuick would meet with Kara around other court hearings and they often texted each other. The trial court looked to these facts and also

---

[7] Part of that scolding by the trial court derived from a misunderstanding about notes taken by various social workers that were stored in the County's electronic database. Even the County and one of the social workers, however, were unaware as to precisely how the system worked and which parts were visible to other workers.

emphasized VanCuick's vast CHIPS and TPR experience and determined that she had adequately reviewed the relevant materials.

¶25    After a careful review of the trial transcripts—with an emphasis on VanCuick's direct and cross-examination questions—this court concludes that VanCuick was more than adequately prepared for the jury trial.  This court did not find, as Kara asserts, "a host of unreasonable errors at trial that *stemmed* from inadequate preparation."  Even though, as the trial court noted, there were times VanCuick's questions were convoluted or could have been better phrased, Kara was not entitled to a perfect or ideal attorney.[8]  *See State v. Burton*, 2013 WI 61, ¶48, 349 Wis. 2d 1, 832 N.W.2d 611; *State v. Balliette*, 2011 WI 79, ¶22, 336 Wis. 2d 358, 805 N.W.2d 334; *State v. Thiel*, 2003 WI 111, ¶19, 264 Wis. 2d 571, 665 N.W.2d 305 (an attorney's trial preparation "need not be perfect, indeed not even very good, to be constitutionally adequate" (citation omitted)).  VanCuick's preparation was adequate to enable effective representation during Kara's six-day jury trial.

---

[8]  The trial court wisely noted:

> We all know that evidence doesn't always come in as we expect during the course of a trial and we deal with that.
>
> In and of itself is that deficient?...  I don't believe that it is deficient again because of that reason and in fact this is one of the witnesses that Attorney VanCuick spoke to.

## II. Trial counsel's strategic decisions during trial were not deficient performance.

### A. Statements about the value of permanence for Josh

¶26 Kara contends there were several instances—without objection from VanCuick—when the County and the guardian ad litem "invited the jury to consider Josh's best interests and to find grounds based on those interests—not on the evidence," contrary to ***Door County Department of Health & Family Services v. Scott S.***, 230 Wis. 2d 460, 468, 602 N.W.2d 167 (Ct. App. 1999). Kara complains that this set the jury on a course to look beyond the purpose of the grounds-phase trial and unfairly prejudiced Kara. Kara does not address the clear instructions made by the trial court at the start[9] of the trial that explain the concept of permanence as it relates to the jurors' deliberations:

> This hearing is part of the process that was started by the filing of a petition by the Kenosha County Division of Children and Family Services. The petition asks that the parental rights of [Kara] to [Josh] a two-year-old child be terminated.
>
> The petition alleges that [Josh] is in need of protection or services and that [Kara] failed to assume parental responsibility for [Josh]. I want to emphasize to you that this hearing is only one part of a two-part process that may terminate [Kara]'s parental rights to [Josh].
>
> You will not be asked to decide if [Kara]'s parental rights should be terminated. Your responsibility is to determine whether the grounds for termination alleged in the petition have been proved. In doing so you should not consider what the final result of this proceeding might be.
>
> If you determine that grounds for termination of [Kara]'s parental rights have been proved it is my

---

[9] Similar instructions were given at the conclusion of the trial, immediately prior to deliberations.

responsibility to determine whether her parental rights should be terminated.

….

Remarks of the attorneys are not evidence. If any remarks suggest certain facts not in evidence disregard the suggestion.

….

The purpose of an opening statement is to outline for you what each side expects to prove so that you will better understand the evidence as it is introduced during the trial. I must caution you however that the opening statements are not evidence.

¶27 Almost immediately after these instructions were read to the jurors, the County's counsel made her opening statement, without objection, and focused upon how Kara had, for over two years, failed to meet the requisite conditions to have Josh returned to her home:

So first in terms of the facts, [Josh] was born November 24th, 2020, so at this point he is two-and-a-half years old.

He has spent every day of the last 26 months so two years, two months in out of home care. Placed in foster care. Raised by a licensed foster care provider ... here in Kenosha. For every day since May 24th, 2021, he has been waiting in foster care. Waiting for his biological mother, [Kara], who's present in court to choose him over abusing drugs.

He's been waiting for his biological parent to complete the Judge's conditions. Those conditions of return to safely return [Josh] to a parent's home for the first time since he learned to walk. Since he learned to feed himself. Since he learned to talk. He's been waiting since he was six months old.

Nearly his entire life and he is still waiting today and that's why the 13 of you are here to end the waiting for him and to give him the permanency he deserves.

¶28 Also in the opening statement, the County described how CHIPS cases work—that the parties and the trial court work towards different permanency goals at the same time:

> Every time we com[e] back into court the Judge has to decide what type of permanency we should be working toward for [Josh]. Should the Department of Children and Family Services continue working to reunify [Josh] with [Kara] or has [Kara] completed few to none of those conditions of return?
>
> Has she returned to drug use? Has she returned to unsafe decisionmaking? Again, has there been little progress by [Kara] in getting [Josh] safely home? And when that happens the Judge decides like … this case that the Department of Children and Family Services shouldn't just be working to reunify baby [Josh] with [Kara].
>
> The Judge decides that DCFS should work to provide [Josh] permanency through adoption and that brings us to today. [Josh] has remained in foster care for the last 26 months as I indicated. Two years, two months of his just 32 months of life.
>
> You'll hear evidence that it's time for us to provide baby [Josh] who's now toddler [Josh] with permanency through termination of parental rights. In this case you determine as the jurors whether grounds exist to terminate the parental rights of [Kara] to [Josh].

¶29 Attorney VanCuick did make objections during the guardian ad litem's opening and closing statements that were sustained.[10] In

---

[10] For example:

> [GAL:] We had all kinds of services she's going to. Not completed. Not done. Not shown up for and the thing of it is when you get up in the morning most parents I hope think about what their child needs that day and what [Josh] has needed is his mom to accept the tools Social Services is giving her.
>
> MS. VANCUICK: Objection. Improper argument.
>
> THE COURT: Sustained. This is opening.

addition, she successfully objected several other times, including when the County questioned a social worker about Kara's "compliance with [County in-home] service that was being utilized to keep [Caleb] at home."

¶30    Kara's arguments on this point are without merit. First, jurors are presumed to follow instructions provided to them by the trial court. *Weborg v. Jenny*, 2012 WI 67, ¶69, 341 Wis. 2d 668, 816 N.W.2d 191; *State v. Grande*, 169 Wis. 2d 422, 436, 485 N.W.2d 282 (Ct. App. 1992). Neither opening statements nor closing arguments are evidence, and jurors are cautioned to remember that when they deliberate. *See Mayo*, 301 Wis. 2d 642, ¶44. The trial court properly advised the jurors, telling them twice that closings and other statements by the attorneys are *not* evidence.

¶31    Next, the phrase "best interests" was never mentioned during the six-day jury trial. The concept of "permanency" *was* mentioned, but that was done to explain CHIPS procedures and the permanency planning for if and when Kara's conditions for return were met. Moreover, VanCuick's objection to the potentially improper phrasing in the closing by the guardian ad litem was sustained.

¶32    Finally, VanCuick explained it was her trial strategy to avoid objections during opening statements and closings because they are not evidence, the jurors do not have their note pads, and sometimes objections "draw more attention to whatever was said." As another part of her trial strategy, VanCuick tries to spin negative facts in a positive light in lieu of making multiple objections. Even with that reasonable overall strategy, VanCuick did eventually object when the guardian ad litem went too far over the line.

¶33    The trial court found that VanCuick's opening and closing objection techniques were strategic, were understandable given the jury instructions, and were rationally based on the facts and circumstances present in Kara's trial. Accordingly, it found VanCuick's conduct in this respect was not deficient.

¶34    Given the strong presumption that jurors will heed jury instructions, together with VanCuick's trial strategy and the fact that the phrase "best interests" was never mentioned, this court also determines that the lack of objections to the passing comments about permanency did not rise to the level of imperfect, much less deficient, assistance of counsel.

### B.    Statements about Caleb

¶35    Finally, Kara complains that VanCuick "open[ed] the door" to detrimental information about Caleb and his CHIPS case. The testimony about Caleb was addressed twice in sidebars. On the first day of trial, during the redirect examination of a social worker, Attorney VanCuick objected when the questions turned to the services in place for Caleb and sought a sidebar. VanCuick expressed concern that neither she—nor the trial court—could "un-ring the bell" that Kara had another child for which she was already receiving services from the County.

¶36    The trial court issued a ruling that allowed the County to raise issues regarding Kara's drug and alcohol history and the services provided to her *prior* to Josh's birth, but it could not discuss Caleb and his CHIPS case in order to avoid "the inflammatory things ... about the ... different child who's not relevant to his proceeding."

17

¶37    The next day, Attorney VanCuick "opened the door" to testimony about Caleb when she asked follow up questions to a social worker.  There followed a lengthy and heated discussion between all counsel and the trial court about whether the door had in fact been "opened" with respect to Caleb, whether Kara's prior drug history was relevant, and whether VanCuick had done enough discovery.  Even after the long dialogue and a comment that VanCuick had opened the door to all testimony about Caleb, the court reined all counsel in and limited what could be said about Caleb (nothing) and Kara's prior drug history (anything, with the caveats that drug overuse is not necessarily an "overdose").

¶38    Regardless of VanCuick's explanation—that she was only following up on questions the County had raised about services for Caleb—Kara now alleges that VanCuick was not only not diligent in her trial preparation, but she negligently raised issues that damaged Kara during the trial.  This court has already addressed the question of trial preparation.

¶39    To put the allegations about Caleb into perspective, it is important to note that this was not a standard termination of parental rights case; the parent was already receiving services and under court orders with respect to the older child. This fact cut both ways for the County and Kara.  First, the County's hands were tied in some respects by not being permitted (for a fear of prejudice) to delve into *why* Kara was under services before Josh was born while still needing to explain why the County was involved in Kara's life.  But, on the other hand, VanCuick aptly noted that *with respect to Josh* it was not relevant if Kara had met conditions for return regarding Caleb.  The trial court had to dance on the top of a pin by weighing how to get appropriate information to the jury to explain why Kara was

18

already under County supervision while not painting her as previously labeled an unfit parent.

¶40 VanCuick contended that the County had already raised the circumstances surrounding Caleb's case and Kara's past drug history. That type of history predating Josh's birth was relevant and admissible. *See La Crosse Cnty. Dep't of Hum. Servs. v. Tara P.*, 2002 WI App 84, ¶13, 252 Wis. 2d 179, 643 N.W.2d 194 (stating that evidence of a parent's prior conduct "may be relevant to predicting a parent's chances of complying with conditions [of return] in the future"). Moreover, "events predating dispositional orders may also be relevant to another issue at termination proceedings: whether a county department of social services made 'reasonable' efforts to provide services ordered by a court." *Id.*, ¶14 n.4. Thus, the trial court here had to balance allowing admissible evidence of Kara's past struggles with drugs while avoiding the specter of a prior "unfit parent" label. VanCuick, too, had to be able to distinguish prior history from what Kara had successfully accomplished with respect to Josh and his conditions for return.

¶41 This court concludes that the trial performance of VanCuick did not fall below the bar for effective assistance of counsel. "A [party] does not show the element of deficient performance 'simply by demonstrating that [her] counsel was imperfect or less than ideal.'" *Burton*, 349 Wis. 2d 1, ¶48 (quoting *Balliette*, 336 Wis. 2d 358, ¶22). Nor does "effective" equate to successful. "A court must be vigilant against the skewed perspective that may result from hindsight, and it may not second-guess counsel's performance solely because the defense proved unsuccessful." *Balliette*, 336 Wis. 2d 358, ¶25.

19

**II.     There was no prejudice to Kara.**

¶42     Despite not making a thorough or detailed argument during the *Machner* hearing that Kara was prejudiced by VanCuick's alleged deficient performance, Kara now asserts that the "cumulative effect of Attorney VanCuick's errors was prejudicial."  Again, she contends that a "best interests" invocation was severely prejudicial and the news another child was removed from her care would lead a jury to believe Josh should be removed "regardless of the sufficiency of the evidence."  Kara also argues—in effect—that because she struggles with depression and she had met some of the conditions for return, it just wasn't her fault she could not meet all of them or that the County simply made inadequate efforts to provide assistance.

¶43     Kara's last argument is simply an attempt to persuade this court to invade the province of the jury and find facts regarding the grounds for termination.  The court declines that invitation.  The jury heard the evidence and was instructed multiple times that its verdict was to be based "solely upon the evidence," that it was not to consider the ultimate permanent placement of Josh, and that statements by attorneys are not evidence.

¶44     Not only was the jury the final arbiter of the facts presented via admissible evidence, it was also permitted to rely upon observations of the parties in the courtroom.  Through a witness's direct examination, the County introduced evidence that overuse of Xanax can lead to "nodding off."  Then, in its closing, the County suggested that Kara was doing precisely that during the trial.  The trial

court made the same observation at the best-interest hearing.[11]  There was nothing VanCuick could have done to counter this fact.

¶45    Kara's argument that VanCuick's failure to object to the "best interests" evidence was prejudicial is remarkably similar to an argument rejected by the court in *Scott S.*, 230 Wis. 2d at 469.  There, the court found that the evidence that the parent failed to satisfy the conditions of return was overwhelming.  *Id.*  Likewise, in this case, there is no question that Kara did not meet her conditions of return over the two-plus years that Josh was in foster care.  The *Scott S.* court "reject[ed] the contention that the GAL's comments convinced the jury to find the existence of grounds for the termination of parental rights when they otherwise would not have."  *Id.*  The same applies here.

¶46    Given the circumstances in this case, the overwhelming evidence presented by the County, and the jury instruction admonitions, this court concludes Kara has failed to meet the high bar to establish she was prejudiced by the actions—or inactions—of VanCuick.  There is no reasonable probability that the jury would not have found both grounds for terminating Kara's parental rights had VanCuick raised more objections.

---

[11] The trial court stated:

> I can tell you that even at the trial I even though the mother testified that it wasn't the case, everybody I would say in the courtroom observed it and I did.
>
> There was one morning where she just couldn't even stay awake and she was head bobbing and should be her -- her head would go down and then would pop up.  I don't know what that was all about, but even for trial on a really important issue she couldn't remain focused and awake.

21

**CONCLUSION**

¶47    "As ***Strickland*** reminds us, there is a 'wide range of professionally competent assistance,' and the bar is not very high." ***State v. Westmoreland***, 2008 WI App 15, ¶21, 307 Wis. 2d 429, 744 N.W.2d 919 (2007) (citation omitted); *see also **Yarborough v. Gentry***, 540 U.S. 1, 11 (2003) (lawyer need not be a Clarence Darrow to survive an ineffectiveness contention).  No one—not even VanCuick—contends that she was perfect.  But that does not constitute a failure to provide professionally competent assistance to Kara.  Based upon the facts in this matter, this court concludes that Kara has failed to establish that VanCuick provided deficient, ineffective assistance of counsel or that Kara suffered any prejudice.  The trial court's conclusions are upheld.

*By the Court.*—Order affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)4.